Jackie Wesley ARCHER, Jr., Appellant
(Defendant Below)

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 59S00–9605–CR–00314.

Supreme Court of Indiana.

Nov. 19, 1997.

As Amended on Denial of Rehearing
Feb. 18, 1998.

David A. Smith, McIntyre & Smith, Bedford, for Appellant.

Pamela Carter, Attorney General, Cynthia Ploughe, Deputy Attorney General, Indianapolis, for Appellee.

SELBY, Justice.

On July 26, 1995, Jackie Wesley Archer, Jr. ("defendant") pleaded guilty but mentally ill to four Class A felonies which included attempted murder, rape, and two counts of criminal deviate conduct. On the same day, the trial court conducted a bench trial on a fifth habitual offender count, and, after hearing evidence that defendant had been convicted previously of two unrelated felonies, the court found that defendant was a habitual offender. Defendant now appeals his sentence totaling one hundred sixty-five (165) years solely on the ground that the court abused its discretion when it failed to make appropriate findings, and that the resulting sentence is manifestly unreasonable. We find that the trial court failed to give weight to the mitigating circumstance of defendant's mental illness, and, therefore, we reduce defendant's sentence to a total of one hundred twenty-five (125) years.

### FACTS

At the hearing on his plea of guilty but mentally ill, defendant testified that, in the early morning hours of May 7, 1994, after consuming alcoholic beverages and smoking marijuana at his ex-girlfriend's house, he left and went to the trailer home of the victim, Cathy Wright. He knew Wright as the wife of the man from whom he was purchasing a car.

Upon arriving at Wright's trailer, he brandished a knife at her and forced his way through the front door. He demanded money, and when she indicated that she had no money to give him, he ordered her to disrobe and go to the bedroom. While in the bedroom with her and in possession of the knife, he threatened to kill her and forced her to have sexual intercourse with him. He also forced her to engage in oral and anal sex, while he continued to threaten her life.

At one point during the episode, Wright attempted to escape. Defendant pursued her with his knife in hand and caught her outside the trailer. When she grabbed for the knife, he stabbed her sixteen times, once in the neck and numerous times in the abdomen and chest area. Defendant, then, think-

ing she was dead or dying, left her in the yard outside her trailer and fled the scene.

When Wright regained consciousness, she was able to crawl back into her home and call for assistance.

On July 26, 1995, defendant pleaded guilty but mentally ill to attempted murder, rape, and two counts of criminal deviate conduct. The court and both counsel questioned defendant on the record regarding the events of May 7, 1994. Defendant testified as to those events. He also testified that he believed himself to be suffering from intermittent explosive disorder and antisocial personality disorder at the time of the crimes. Three court-appointed psychiatrists previously had filed their reports with the court. The trial court determined that defendant's plea of guilty but mentally ill was voluntary, and that there was a factual basis for the plea.[1]

## DISCUSSION

In evaluating defendant's claim that his sentence is manifestly unreasonable, we first consider the evidence, including the evidence of mental illness and the court's findings thereon. We then review the appropriate standard of review and apply it to the facts in this case.

### I. *Sentencing Hearing and Evidence of Mental Illness*

At the sentencing hearing on January 12, 1996, the court had before it the reports of three court-appointed psychiatrists, medical records from Dr. Shellenberger's clinic, and the Presentence Report which outlined defendant's lengthy juvenile and adult criminal records. The court also heard testimony from the victim, defendant, Detective Chambers, and Dr. Shellenberger.

The medical records and evidence before the court show that defendant has been in and out of mental health centers for evaluation or treatment since he was a juvenile. He began drinking when he was seven or eight, and continued drinking as an adult, often heavily, and sometimes as much as one or two cases of beer in a day. He also has

experimented with cocaine and LSD, and regularly smokes marijuana.

During the late 1970s and early 1980s, while still a juvenile, he was arrested for various theft and vandalism offenses and placed on probation several times. He was repeatedly truant from school and involved in fights, had a poor academic record, and ultimately school officials dismissed him. As a result, between 1978 and 1984, a number of mental health professionals evaluated him. They judged him at various times to be in the low average range of intelligence, to have difficulty with visual motor tasks, to have an adjustment reaction to adolescence, and to have a conduct disorder related to his lying and stealing. Mental health professionals also concluded that there was some evidence of "a learning disability and parallel organic impairment," and that it was likely that defendant was experiencing some depression and emotional distress related to conforming his behavior to the limits and boundaries of his environment. (R. at 499.)

While defendant was incarcerated in the late 1980s and early 1990s, he suffered from nervousness, sleep difficulties, and a bad temper. Defendant reported that sometimes he became so angry that he could not remember what happened when he had his temper outbursts, and also reported one suicide gesture in 1987 when he could not get access to a person he wanted to "get even with." (R. at 529.) Defendant began taking doxepin (also referred to as "sinequan"), an anti-depressant.

In 1992, while defendant was still in prison, Dr. Shellenberger, one of the psychiatrists who was later appointed by the court to evaluate defendant, first diagnosed defendant as having antisocial personality disorder, a disorder which generally begins at an early age and continues into adulthood.

On March 30, 1994, approximately five weeks before committing the crimes at issue, defendant, on his own initiative, visited a mental health center and reported that he was aggressive, had frequent fights, and could not keep a job. He reported to Dr. Shellenberger and his colleague that he had

---

**1.** *See* Ind.Code § 35–35–1–3 (1993).

a bad childhood, and that his father beat his mother and him. He admitted to a history of drug and alcohol abuse. He stated that when he drinks whiskey he gets angry and mean. He said he hears a voice and sometimes two voices that talk to him. Sometimes the voices tell him to go out into the woods, and sometimes they tell him to hurt himself or someone else. When the voices aggravate him, he drinks beer to calm himself down. During the interview, Dr. Shellenberger observed that defendant looked angry, looked over his shoulder several times, and rocked in his chair constantly throughout the interview.

Dr. Shellenberger again noted that defendant meets the criteria for antisocial personality disorder, and diagnosed defendant as having intermittent explosive disorder. Dr. Shellenberger also diagnosed defendant as having an alcohol addiction, hallucinations with the exact etiology uncertain and the possibility of a schizophrenia spectrum disorder. He prescribed doxepin and stelazine, which is a powerful tranquilizer used mainly for treating psychosis, and recommended that defendant keep his mental health appointments.

Defendant did not keep his follow-up appointments and did not begin his medication.

Approximately three weeks after his interview with Dr. Shellenberger, defendant committed the crimes at issue. The court appointed three psychiatrists—Dr. Shellenberger, Dr. Crane, and Dr. Kane—to perform psychiatric examinations for the purpose of determining whether defendant was competent to stand trial, and whether defendant was legally sane at the time of the offense.

Dr. Shellenberger met with defendant again on June 7. Defendant reported that during the week prior to committing the offenses, he was agitated and had difficulty with his temper. He threatened a co-worker, had a falling out with his girlfriend, and got into a fight with his sister who gave him a black eye. His sleep was erratic and he lost seven pounds, as he was not eating well. He stated that when he is alone and things are quiet, his voices comfort him, but when he gets agitated and angry the voices increase

his agitation. When asked if he was hearing voices during the interview, he said, "I don't want to say what they are saying. I don't want to hurt anyone." (R. at 457.) Dr. Shellenberger reported that, while he became increasingly agitated as the interview progressed, his thinking appeared to be logical and sequential, and he was oriented as to time, place, and person. Dr. Shellenberger again diagnosed defendant as having intermittent explosive disorder, hallucinations of an uncertain etiology, alcohol addiction and again noted that he meets the criteria for antisocial personality disorder.

Dr. David G. Crane interviewed defendant on June 10, 1994. When Dr. Crane questioned defendant about the events of May 7 and discrepancies between his description of events and those which he reportedly provided to the detective who prepared the Probable Cause Affidavit, he became angry, refused to answer any additional questions, and terminated the interview early. Dr. Crane concluded that defendant was competent to stand trial, and that he was not insane at the time of the offense, but otherwise made no diagnosis.

Dr. Kane reviewed the evaluations of Drs. Shellenberger and Crane and also interviewed defendant on December 14, 1994. Dr. Kane observed that, while defendant stated that he heard voices when he was angry, there did not appear to be any classically bizarre delusions or preoccupations and his thought processes were sequential. Dr. Kane further observed that while he was cooperative during much of the interview, defendant refused to answer some questions and at several points he appeared distractible. He would stare out the window or glare at Dr. Kane in a threatening manner. At one point, when Dr. Kane asked him what he would do if he made him angry, defendant said that he would probably come after him even though he was handcuffed. He stated: "Society made me, now they are going to have to deal with me." (R. at 612.)

Dr. Kane also observed that "due to poor impulse control, problems with tolerating frustration, and frequent episodes of alcohol intoxication that he exercises very poor judg-

ment." (R. at 612.) He also opined that defendant was feigning some psychiatric symptoms. Dr. Kane diagnosed defendant with the following conditions: alcohol dependance, cannabis dependance, malingering, and antisocial personality disorder. Dr. Kane disagreed with Dr. Shellenberger's diagnosis of intermittent explosive disorder and his finding that defendant suffered from hallucinations. Kane also concluded that defendant was competent to stand trial and not insane at the time of the offense.

The Presentence Report before the trial court reflects that defendant's juvenile offenses dated back to 1978. The robbery and theft felony offenses upon which his habitual offender status was based resulted in his incarceration for four years on the 1988 robbery conviction, after he grabbed a woman by the throat and demanded money, and for eighteen months on the 1992 theft conviction. The Presentence Report also states that he was convicted of another theft offense, public intoxication, and criminal mischief, and, in addition, defendant admitted to Dr. Crane that he was convicted of contributing to the delinquency of a minor, for which he served six months in jail, although that offense does not appear in his Presentence Report.

Dr. Shellenberger, the only expert who testified at the hearing, emphasized that defendant's mental illness was long-standing, and that defendant reported that he had been bothered by voices since he was a child. He testified that he had seen defendant four or five times since June of 1994, and that he had improved somewhat. Defendant reported that he sleeps better and is not as irritable and angry, and that the voices are manageable and sometimes gone. Dr. Shellenberger stated that defendant's improvement and ability to substantially control his behavior seemed to be the result of the medication, which he believed defendant was taking, and the fact that defendant probably had not had access to alcohol since being incarcerated.

## II. *Findings and Sentencing Decision*

At the conclusion of the sentencing hearing, the trial court stated that this case was probably one of the most egregious cases that has come before the court in sixteen and a half years. The court went on to consider any aggravating or possible mitigating circumstances. The court found the following aggravating circumstances: (1) that defendant has a history of criminal activity dating back to 1978; (2) that defendant was on parole at the time of the commission of the crimes; (3) that there is a severe risk that defendant will commit another crime, particularly a violent crime against another human being; (4) that the attempted murder was violent, with the victim having been stabbed sixteen times and abandoned as dead; (5) that defendant alternated between various forms of forced sexual activities in a brutal manner; (6) that defendant subjected the victim to psychological and physical pain over a period of time not less than one hour; and (7) that defendant is in need of correctional or rehabilitative treatment that can best be provided by commitment to a penal facility.

The court further found that, in light of its other findings, imposition of a reduced sentence or the suspension of the sentence and imposition of any probation or reduction of the sentence, would depreciate the seriousness of the crime. The court stated that it had considered defendant's prior criminal record, as well as the character and condition of defendant, and the fact that he admitted that even while incarcerated he used illegal drugs. The court also stated that it had considered defendant's oral testimony and the possible mitigating circumstances, but found only one mitigating circumstance, that is, defendant's psychological problems. As to these problems, the court stated:

> The Court has reviewed the possible mitigating circumstances in this particular case, and although the Court does find that there is some evidence presented to the Court that the defendant has some psychological problems, the Court does not find that those psychological problems are to such an extent as to make it impossible for the defendant to control his actions and behavior in society. The Court further finds that any aggravating circumstances, as indicated by the Court, far outweigh, that one mitigating circumstance.

(R. at 662–63.) The court's written sentencing order provides no further discussion of the aggravating circumstances or of the one mitigating circumstance.

The trial court sentenced defendant to the forty-five (45) year maximum on each of the four felony counts, and, in so doing, enhanced the twenty-five (25) year presumptive sentence applicable on the date defendant committed the crimes, by the maximum amount of twenty (20) years.[2] The court specified that the two counts for criminal deviate conduct were to run concurrently with one another, but consecutively to the other two counts. The court also sentenced defendant to an additional thirty (30) years because of his status as a habitual offender. Thus, having found that defendant was guilty but mentally ill and that the aggravating circumstances far outweigh the one mitigating circumstance, the court gave little or no weight to defendant's mental illness as a mitigating circumstance and imposed a sentence totaling one hundred sixty-five (165) years.

III. *Standard of Review and Analysis*

■ Sentencing decisions rest within the sound discretion of the trial court, and we generally review sentencing only for abuse of discretion. *Morgan v. State*, 675 N.E.2d 1067, 1072 (Ind.1996). The trial court's discretion includes the ability to determine whether the presumptive sentence for a crime will be increased or decreased because of aggravating or mitigating circumstances, *Smith v. State*, 675 N.E.2d 693, 697 (Ind. 1996), and whether sentences on different counts will be served concurrently or consecutively. *Mott v. State*, 273 Ind. 216, 402 N.E.2d 986, 988 (1980).

■ When the trial court imposes a sentence other than the presumptive sentence, or imposes consecutive sentences where not required to do so by statute, we will examine the record to ensure that the court explained its reasons for selecting the sentence it imposed. *Hammons v. State*, 493 N.E.2d 1250, 1254 (Ind.1986). The trial court's statement of reasons must include the following three elements: (1) identification of all significant mitigating and aggravating circumstances found; (2) specific facts and reasons which lead the court to find the existence of each such circumstance; and (3) articulation demonstrating that the mitigating and aggravating circumstances have been evaluated and balanced in determination of the sentence. *Morgan v. State*, 675 N.E.2d at 1073.

Defendant argues that the court erred when it failed to find defendant's mental illness to be a mitigating circumstance. At the same time, defendant argues that, while the court paid "lip service" to defendant's mental illness, it failed to make appropriate findings, and, as a result, defendant concludes that the trial court imposed a manifestly unreasonable sentence.

■ With regard to defendant's assertion that the sentencing court failed to find that defendant's mental illness was a mitigating circumstance, we disagree. It is true that the written sentencing order makes no mention of defendant's mental illness. Nevertheless, the court's oral statement at the sentencing hearing does find that defendant was mentally ill on the day of the offenses.

More importantly, however, the court was required to make a finding that defendant was guilty but mentally ill at the time of the offense when it accepted his plea of guilty but mentally ill. *Walton v. State*, 650 N.E.2d 1134, 1135 (Ind.1995). *See also* note 1 *supra*. Mentally ill in this context is defined by statute as "having a psychiatric disorder which substantially disturbs a person's thinking, feeling, or behavior and impairs the person's ability to function." Ind.Code § 35–36–1–1 (1993). We conclude that the sentencing court made the required finding of mental illness at the time it accepted defendant's

---

**2.** On May 7, 1994, the date defendant committed the crimes at issue, the relevant statute provided, in pertinent part: "A person who commits a Class A felony shall be imprisoned for a fixed term of twenty-five (25) years, with not more than twenty (20) years added for aggravating circumstances or not more than ten (10) years subtracted for mitigating circumstances...." Ind.Code Ann. § 35–50–2–4 (West 1986 & Supp. 1996). In 1995, the statute was amended to substitute "thirty (30)" for "twenty-five (25)" years, as it read prior to the 1994 amendment. *Id.* (discussing the history of the legislative changes).

plea and then again orally at the sentencing hearing.

 To the extent that defendant argues that the court was required to credit one expert over another or to accord a specific weight to defendant's mental illness as a mitigating factor, again, we disagree. A sentencing court is not required to credit or weigh a possible mitigating circumstance as defendant suggests it should be credited or weighed. *See Scheckel v. State,* 620 N.E.2d 681, 684–85 (Ind.1993); *Fugate v. State,* 608 N.E.2d 1370, 1374 (Ind.1993); *Hammons v. State,* 493 N.E.2d at 1254–55. *See also Harris v. State,* 499 N.E.2d 723, 730 (Ind.1986). Moreover, when a sentencing court finds that both aggravating and mitigating circumstances are present and performs the required balancing process, the balancing test need not be quantitative, and is generally qualitative. *See Penick v. State,* 659 N.E.2d 484, 488 (Ind.1995). Thus, even where a sentencing court finds a mitigating circumstance such as a mental illness exists, it generally need not assign a substantial positive or numerical value to the circumstance.[3]

The fact that defendant pleaded guilty but mentally ill does not change these fundamental principles. As we have previously emphasized, the guilty but mentally ill verdict invokes no special sentencing scheme. *Gambill v. State,* 675 N.E.2d 668, 676 (Ind.1996). The statute provides that a court shall sentence a defendant who is guilty but mentally ill "in the same manner as a defendant found guilty of the offense." *Id.* at 676 (citing the statute). *See also Scammahorn v. State,* 506 N.E.2d 1097, 1099 (Ind.1987); *Whitt v. State,* 497 N.E.2d 1059, 1061 (Ind.1986); *Green v. State,* 469 N.E.2d 1169, 1174 (Ind.1984). The only special consideration given to the guilty but mentally ill defendant is set out in Section 35–36–2–5(b) (1993 & Supp.1996), which provides that such a defendant, if committed to the Department of Corrections, "shall be further evaluated and then treated in such a manner as is psychiatrically indicated for his mental illness." *Gambill v. State,* 675 N.E.2d at 676 (citing the statute). Thus,

defendant in this case is not automatically entitled to any particular credit or deduction from his otherwise aggravated sentence because he is guilty but mentally ill.

 Turning to the articulation and balancing of aggravators and mitigators in this case, we conclude that, while the court properly found several aggravating factors, it also inappropriately found, and apparently gave weight to, two aggravating factors that are not applicable in this case. It is not enough for the sentencing court to simply state that defendant "is in need of correctional or rehabilitative treatment that can best be provided by commitment of the person to a penal facility." Ind.Code § 35–38–1–7.1(b)(3)(1993 & Supp.1996). For this aggravator to have effect, the court must explain why defendant is in need of treatment in a penal facility for a period in excess of the presumptive sentence. *See Smith v. State,* 675 N.E.2d at 697–98. The court did not do so here.

 Moreover, recent cases have concluded that the statutory aggravating factor "imposition of a reduced sentence would depreciate the seriousness of the crime," Ind. Code § 35–38–1–7.1(b)(4), only supports a refusal to reduce the presumptive sentence. The sentencing court should not use this statutory factor when considering whether defendant should receive less than the maximum enhanced sentence, as we gather the court used it here. *See, e.g., Grund v. State,* 671 N.E.2d 411, 419 (Ind.1996); *Penick v. State,* 659 N.E.2d 484, 488 (Ind.1995); *Barany v. State,* 658 N.E.2d 60, 67 (Ind.1995).

 With regard to the one mitigating factor, to the extent that the court here makes any effort to go beyond a conclusional assertion that defendant has "some psychological problems," the court seems to base its statement on the faulty premise that mental illness is an all or nothing proposition, and that unless a defendant is without any ability to control his actions and behavior by virtue of his mental illness, the court should accord little or no weight to his mental illness as a mitigating factor. Specifically, the court

---

3. *See Jones v. State,* 467 N.E.2d 681, 685–86 (Ind.1984)(rejecting an approach that would require a sentencing court to give a substantial positive value to the absence of prior criminality as a mitigating circumstance).

stated that defendant's psychological problems are not "to such an extent as to make it impossible for the defendant to control his actions and behavior in society." (R. at 663.) The court's premise is inconsistent with the nature of mental illness, as it has been described by the governing statute which defines it as including any disorder that "substantially disturbs" a person's behavior and "impairs" the person's ability to function. Ind.Code § 35–36–1–1. Thus, while a defendant's ability to control his behavior may be one important factor to consider when evaluating the weight to be accorded a defendant's mental illness, it is also appropriate to recognize degrees of impairment of that ability, as well as other factors such as the overall limitations upon functioning and the long-standing nature of the mental illness.[4] Stated another way, there may be many kinds of mental illnesses and different degrees to which a person's behavior can be "substantially disturbed" or his ability to function

"impaired," within the meaning of Ind.Code § 35–36–1–1.[5]

Thus, in a case where the court finds that defendant, who is mentally ill but able to distinguish right from wrong and therefore not legally insane,[6] suffers from a serious mental illness, particularly a long-standing illness, or where that defendant's visions or voices led to bizarre behavior and played an integral part in the crime, the court may decide not to impose an enhanced sentence or may decide to otherwise accord significant weight to defendant's mental illness as a mitigating factor.[7] On the other hand, where the mental illness is less severe and defendant appears to have more control over his thoughts and actions, or where the nexus between defendant's mental illness and the commission of the crime is less clear, the court may determine on the facts of a particular case that the mental illness warrants relatively little or no weight as a mitigating factor.[8]

4. *See Evans v. State*, 598 N.E.2d 516, 518 (Ind. 1992)(the long-standing existence of a mental illness as well as its limitation upon functioning are important considerations when evaluating the appropriateness of a sentence).

5. *Cf. Johnson v. State*, 584 N.E.2d 1092, 1099 (Ind.1992)(in the context of evaluating the voluntariness of a statement, reasoning that alcohol and drug intoxication as well as mental illness vary in severity and are subject to "change and variation").

6. Ind.Code § 35–41–3–6 (1993).

7. *See, e.g., Gambill v. State*, 675 N.E.2d 668, 677–78 (Ind.1996)(revising a sentence for murder from 60 to 40 years where a jury rejected insanity and intoxication defenses, despite unanimous expert testimony that defendant was insane, and found defendant guilty but mentally ill; defendant, a paranoid schizophrenic who saw "visions," murdered her child while suffering from a psychotic delusion); *Barany v. State*, 658 N.E.2d 60, 67 (Ind.1995)(revising a sentence for murder from 60 to 40 years where a jury rejected an insanity defense, despite unanimous expert testimony that defendant was insane, and found defendant guilty but mentally ill; defendant, who had been smoking marijuana, murdered his housemate after biting off and swallowing her finger because "voices" directed him to do these things); *Walton v. State*, 650 N.E.2d 1134, 1135, 1137 (Ind.1995)(revising a sentence for two counts of murder from 120 to 80 years after defendant pleaded guilty but mentally ill; the sixteen-year-old defendant,

who murdered his adoptive parents and had no prior record, had been diagnosed with mental illnesses ranging from personality and emotional disorder warranting psychiatric treatment, to outright schizophrenia with auditory hallucinations); *Christopher v. State*, 511 N.E.2d 1019, 1021, 1023 (Ind.1987)(revising sentence for murder from 60 to 50 years after jury rejected an insanity defense and found defendant guilty but mentally ill; defendant, who for several years had been experiencing delusions and suffered from organic delusional syndrome due to amphetamines, murdered his sleeping wife while on release from a mental hospital where he was undergoing voluntary treatment, and then took an overdose in an effort to kill himself).

8. *See, e.g., Barnes v. State*, 634 N.E.2d 46, 49–50 (Ind.1994) (affirming a sentence of 60 years for murder where a jury, after hearing conflicting testimony on the insanity defense, found defendant guilty but mentally ill; defendant shot store clerk who had evicted him from the premises); *Darby v. State*, 514 N.E.2d 1049, 1052, 1056 (Ind.1987) (affirming a sentence of 10 years for involuntary manslaughter after jury rejected defendant's insanity defense and found defendant guilty but mentally ill; defendant shot her boyfriend when she found that he spent the night with another woman and based her insanity defense on her inability to recall the events surrounding the shooting); *Scammahorn v. State*, 506 N.E.2d 1097, 1098–99 (Ind.1987) (affirming sentence of 20 years for attempted murder after jury found defendant guilty but mentally ill; de-

■ On the specific facts of this case, the court should have assigned some weight to defendant's mental illness as a mitigating factor. While the experts who diagnosed defendant came to somewhat different conclusions, they were in agreement that defendant had a long-standing mental illness that had affected his ability to control his impulses since he was a child. It is also uncontroverted that throughout his life he has been directed to or has sought out mental health professionals. He was diagnosed as having adjustment and control disorders as early as 1978, at age ten, and 1983, at age sixteen, and with antisocial personality disorder in 1992, two years before he attacked the victim in this case. Mental health professionals prescribed medication for him, apparently as early as the late 1980s and again in 1992.

Although there are several aggravating circumstances which the court properly found, and although we agree that the facts in this case are "egregious," defendant's mental illness should warrant at least some offset to these aggravating circumstances. We conclude that, because defendant's mental illness is well-documented and longstanding and because it apparently limits his ability to function, it is entitled to some mitigating weight and warrants a reduction of defendant's total sentence.

Accordingly, we affirm defendant's convictions. We reduce his sentence on the attempted murder and rape counts each from forty–five (45) to twenty–five (25) years, thus reducing the total sentence from one hundred sixty-five (165) to one hundred twenty-five (125) years.

SHEPARD, C.J., and DICKSON, SULLIVAN and BOEHM, JJ., concur.

fendant, who tried to shoot his ex-girlfriend and mother of his child after she broke off their relationship, based his insanity defense on the fact that he was suffering from the early stages of Huntington's disease); *Whitt v. State*, 497 N.E.2d 1059, 1059–60 (Ind.1986) (affirming a 60 year sentence for murder after jury found defendant guilty but mentally ill; defendant, who was suffering from schizophrenia, shot a former sheriff with whom defendant had had a history of encounters involving criminal and domestic problems).