## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 06 2020, 9:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Christopher Kunz
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Mekielle Pullins,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

May 6, 2020

Court of Appeals Case No.
19A-CR-2527

Appeal from the Marion Superior Court

The Honorable Grant Hawkins, Judge

The Honorable Peggy Hart, Magistrate

Trial Court Cause Nos.
49G05-1707-F1-26700
49G05-1709-F3-33826

**Brown, Judge.**

[1] Mekielle Pullins appeals her sentences for two counts of aggravated battery as level 3 felonies. We affirm in part, reverse in part, and remand.

## *Facts and Procedural History*

[2] On May 9, 2019, Pullins pled guilty pursuant to a plea agreement to one count of aggravated battery as a level 3 felony in cause number 49G05-1707-F1-26700 ("Cause No. 26700") and one count of aggravated battery as a level 3 felony in cause number 49G05-1709-F3-33826 ("Cause No. 33826").[1] The plea agreement provided the sentences were to run consecutively, and all other terms and conditions were left open for argument before the court. The factual basis provided at the guilty plea hearing for the count under Cause No. 33826, as stated by the prosecutor, was as follows:

> [O]n Wednesday, July 5th, 2017, Officer Endicott (phonetic) of [the Indianapolis Metropolitan Police Department ("IMPD")] was dispatched to the 4300 block of North Michigan Road, the International School, on report of a person assaulted. Upon arrival, he met with D.D.[] D.D. stated he and his girlfriend, whom he identified as [Pullins], got into an argument. He stated that around the intersection of West 42nd Street and Michigan Road, Ms. Pullins began hitting Mr. D.D. in the face.
>
> She then took her LG smartphone and struck Mr. D.D. on the right side of his face, breaking the cell phone and causing pain and lacerations to the right side of his face, and causing his right

---

[1] In addition to the counts for which Pullins pled guilty, the State charged her with attempted murder as a level 1 felony in Cause No. 26700 and battery resulting in serious bodily injury as a level 5 felony in Cause No. 33826, which it dismissed pursuant to the plea agreement. **(App II 108, 228, 230)**

eye to bulge from his eye socket.[2]  He pulled into the parking lot of the International School to call for help.  Ms. Pullins got into the driver's seat of the vehicle and took off northbound on Michigan Road.  Ms. Pullins later crashed in the 4400 block of Michigan Road.

Transcript Volume II at 16.  The factual basis provided for the count under Cause No. 26700 as stated by the prosecutor was as follows:

> [O]n July 18th, 2017, about 1 p.m., Nola Hunt (phonetic) with Indiana Department of Child Services [("DCS")] notified the detectives that she'd received a report less than an hour earlier stating [Pullins], who is 22 years old, had filmed herself obstructing the airway of her one-year-old son, L.D. and sent the video to the child's father, along with threats to kill the child. [Indianapolis Metropolitan Police] Sergeant Eli McAllister received a copy of the video from DCS.  The video depicted [Pullins] standing in front of a bathroom mirror.  In her left hand, the female was holding a cell phone pointed at the mirror.  Her right hand was completely covering the mouth and nose of a small child.  [Pullins] was pressing so hard with her right hand that the child's entire body weight was supported by the force of her grip against the child's face, pressing his head back against her body.  This video lasted approximately ten seconds.  In the audio of the video, the child can be heard audibly trying to breathe and cry out, but is unable to do so due to [Pullins's] hand over his nose and mouth.  It's clear from the video that the airway was obstructed and the child was not allowed to breathe in or out for the duration of the video.  The child also reached up with his right hand for a second or two in the video, grabbed [Pullins's] hand in an attempt to remove it from his mouth.  At

---

[2] The prosecutor indicated D.D. underwent two surgeries related to his eye, he reported "that his vision, up until the second surgery, still remained blurry," and that "doctors were indicating that it could, eventually, come back."  Transcript Volume II at 17.

the same time the child is struggling to remove the hand, he lifts his legs and squirms around, also trying to get free from [Pullins's] grasp. At the end of the video, the child appears to arch his back in effort to get free from the suffocating grasp of [Pullins].

On July 18th of 2017, Detective Chris Lawrence (phonetic) with IMPD spoke to L.D.'s father, D.D.[] He said that he had two children in common with [Pullins], L.D. and E.D. He reported that he received an email from [Pullins] saying she was going to kill L.D.[] Subsequently, he received the video from [Pullins] depicting her suffocating their child.

IMPD Missing Persons Unit was contacted and an Amber Alert was issued for [Pullins] and her three sons, based on concern for the safety of the children. Within a couple of hours of the Amber Alert, police received a call stating the children were located at home, . . . in Indianapolis, Indiana. The children were found by IMPD at the address and taken into DCS custody and then transported to Riley Hospital to be checked.

On July 18th of 2017, D.D. provided written consent for law enforcement to access the email account he had been using to correspond with [Pullins]. He provided law enforcement with the use or login and password, and agreed for investigators to access this account for the purpose of investigating the crimes. When that account was accessed, detectives reviewed the emails from [Pullins] to D.D.[] There was an email located sent from [Pullins] to D.D. at 12:05 a.m. that was marked as read. Attached to the email was that video of [Pullins] suffocating their child. The subject line read, video of me suffocating L.D., and the body of the email read, told you, get him. Aside from the above email, there were two additional emails sent from the same email address, both with the subject line, video suffocating L.D.[] Those were marked as unread. They both contained video attachments, and one of them was a second video of [Pullins] suffocating L.D.[]

The second video was taken in the same bathroom and in the same manner as the first video, but was clearly a different recording than the first. In the second video, the child's hand is attempting to pull [Pullins's] hand away from his mouth, suggesting that this video was filmed shortly after the first video, as in the first video, the child is clearly in distress, trying to cry out and audibly gasp for air, but the woman's hand is covering his mouth and his nose.

There were also numerous emails sent from [Pullins] to the father of L.D. saying things like, I can't wait for L.D. to die, get your baby before I kill him, he deserves to die, he has nobody, Imma just stab him, Imma just stab him to death, I'm stabbing L.D. to death tonight, I hate him, I wish you never gave him to me, I don't love him or you. In addition to the emails and videos, there were several photographs attached to some of the emails from the two email addresses belonging to [Pullins]. They also depict her holding L.D. and requesting D.D. to take the kids for just an hour so she can nap.

The children and the videos were taken at the address of [P.D.] which is located here in Indianapolis. [P.D.] asked [Pullins] about the videos. Initially, [Pullins] told her that the detectives had lied about the videos existing, but when [P.D.] replied that she didn't believe the detectives had lied, [Pullins] admitted to [P.D.] that she filmed herself putting her hands over L.D.'s mouth and sent it to his father, D.D., along with a threat to kill L.D.[]

*Id.* at 13-16. When asked by the court, Pullins indicated she had been diagnosed with depression, "bipolar," and a personality disorder. *Id.* at 18.

[3]     At sentencing, Pullins presented evidence of her mental illness. Licensed clinical social worker Aftan Archer-Cox testified there was a history of mental illness in Pullins's maternal family, Pullins was diagnosed with bipolar disorder

when she was twelve years old and bipolar disorder, substance misuse, and PTSD diagnoses were the "primary diagnoses that are seemingly consistent through the reports." *Id.* at 57. The court admitted Archer-Cox's report as Defendant's Exhibit A, which indicated Pullins's teenage years were filled with traumatizing fights at homes, arrests insisted on by her mother, and stays at residential facilities and foster homes when her mother was unable to manage her behavior; that, while developing bipolar disorder, she was offered treatment through the juvenile system but was unable to maintain results "likely due to [her] unpredictable and volatile home environment"; and that, if her trauma and her bipolar disorder were not specifically addressed, she would be less capable of managing day-to-day living after a lengthy prison sentence. Exhibits Volume at 8. Archer-Cox's report reveals that Pullins had three children before the age of twenty-five and had no job, driver's license, car or money for food, diapers, wipes or milk; she rarely left the house and had little social interaction with adults; she received little to no support from her mother; her father was deceased; and her children's father either was not involved or worked constantly and always left the children in her care.

[4] Clinical psychologist Dr. Stephanie Callaway diagnosed Pullins with bipolar disorder and post-traumatic stress disorder and testified Pullins presents with borderline personality traits and has a history of using alcohol, marijuana, and methamphetamine. When asked to describe how Pullins's methamphetamine use and her mental health interact, Dr. Callaway indicated Pullins self-reported that using methamphetamine "just a little bit" calmed her down and that such

an effect is one which often occurs with individuals with ADHD or bipolar disorder. Transcript Volume II at 75. She answered affirmatively when asked if there had been no regularity in treatment and if it was her opinion that Pullins's mental health issues contributed to the events. Dr. Callaway's evaluation indicated Pullins had been in a non-marital relationship with D.D. since she was eighteen years old and he was approximately thirty-seven years old, that D.D. was the father of L.D. and E.D., the relationship included domestic violence, and he was controlling of the children and her.

[5]     At its conclusion, Dr. Callaway's evaluation states:

> Based on a review of collateral sources and Ms. Pullins['s] self-report, there were numerous situational factors that contributed to her behavior at the time of the offense. Namely, she was under a great deal of duress due to being homeless, their lack of finances, serving as the only caretaker for three children, and detoxing from drugs and alcohol. She described feeling "crazy, desperate, and stupid all at once," with no means of escaping her situation. She felt desperate to get help from [D.D.], but did not have adequate coping skills to effectively ask for help and assistance. Instead, Ms. Pullins[] took desperate actions to try to get her needs and her children's needs met and to try to get help caring for her three children.[3] . . .
>
> MITIGATING FACTORS: A review of the available records and Ms. Pullins' self-report yields the following mitigating factors:

---

[3] In speaking to the court, Pullins testified she made "an unconscionable decision" to create a "staged video" so that D.D., to whom she reached out but received no response, would "take care of his responsibilities," which she believed he would do only if he thought "they were in danger." Transcript Volume II at 83-84.

* * * * *

- Ms. Pullins has serious mental disorders, to include Bipolar Disorder and PTSD, in addition to Alcohol, Marijuana, and Methamphetamine Use Disorders. She also has Borderline Personality Traits, which is considered a mental disorder or condition per the DSM-S. These mental disorders contributed to her poor decision-making and impulsivity during the offense, especially since these conditions were untreated at that time.

Exhibits Volume at 31-32.

[6] Before it sentenced her, the court heard argument from Pullins's counsel and stated:

> I appreciate both sides putting forth the evidence you have today, and I do agree with you, [Pullins's counsel]. I think that you have presented enough facts and circumstances, if you will, to suggest that there is some context to all of this behavior, so I appreciate that, but I'm not quite sure that I – that it's enough for me to find overwhelming mitigation, but I do appreciate the fact that, you know, in my mind, it put it in perspective, if you will, of where you were, and why you did what you did, if you will. So I'll take that into consideration. I'm not necessarily going to find it as a mitigator, though, right now.

Transcript Volume II at 93-94. The trial court found the mitigating circumstances were that Pullins pled guilty, took responsibility for her actions, and saved judicial resources. The court found the aggravating circumstances included her history of juvenile delinquency, "most of which was aggressive behavior," five prior adjudications for batteries, eight adjudications total, and

twenty-five referrals[4]; her history of criminal behavior which included a prior misdemeanor; she was out on bond at time of her offenses; and she caused permanent bodily injury to D.D. and harmed L.D., her child who was approximately one year of age. *Id.* at 94. It sentenced her to eight years under Cause No. 33826 and twelve years with one year suspended under Cause No. 26700 and ordered the sentences to be served consecutively for an aggregate sentence of twenty years with one year suspended. Both sentencing orders indicate the court recommends "mental health treatment while at DOC." Appellant's Appendix Volume II at 20; Appellant's Appendix Volume III at 150. The sentencing orders also provide the court may modify her placement based on good conduct in the Department of Correction ("DOC"). The prosecutor requested that Pullins have no contact with D.D. and L.D. and requested a no contact order for "any minor child, just to be safe," and the court indicated that it would "put any minor child, at this time, since she's obviously going to DOC." Transcript Volume II at 96.

## *Discussion*

[7] Pullins first argues the trial court abused its discretion in sentencing her. Sentencing decisions rest within the sound discretion of the trial court and are reviewed only for an abuse of discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on other grounds on reh'g*, 875 N.E.2d 218 (Ind. 2007).

---

[4] The presentence investigation report, to which both Pullins and the State point, identifies twenty-four juvenile incidences, many of which identify her mother as the complainant.

"An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Id.* (quotation omitted). A trial court abuses its discretion if it: (1) fails "to enter a sentencing statement at all"; (2) enters "a sentencing statement that explains reasons for imposing a sentence – including a finding of aggravating and mitigating factors if any – but the record does not support the reasons"; (3) enters a sentencing statement that "omits reasons that are clearly supported by the record and advanced for consideration"; or (4) considers reasons that "are improper as a matter of law." *Id.* at 490-491. If the trial court has abused its discretion, we will remand for resentencing "if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record." *Id.* at 491. The relative weight or value assignable to reasons properly found, or those which should have been found, is not subject to review for abuse of discretion. *Id.*

[8] Pullins contends the trial court abused its discretion in not considering her mental illness as a mitigator.[5] When, as here, an allegation is made that the

---

[5] Pullins also argues that the court abused its discretion when it considered as aggravators numerous juvenile delinquency petitions which did not reach disposition. While "[o]ne or more arrests, standing alone, do not establish the 'history of criminal or delinquent activity' aggravator to enhance a sentence," *Pickens v. State*, 767 N.E.2d 530, 534 (Ind. 2002) (quoting Ind. Code § 35-38-1-7.1(b)(2) (subsequently amended by Pub. L. No. 71-2005, § 3 (eff. April 25, 2005)) (subsection currently appears as Ind. Code § 35-38-1-7.1(a)(2))), we note the Indiana Supreme Court, in examining an earlier version of Ind. Code § 35-38-1-7.1, has stated:

"While a record of arrests does not establish the historical fact of prior criminal behavior, such a record does reveal to the court that subsequent antisocial behavior on the part of the defendant

trial court failed to find a mitigating factor, the defendant is required to establish that the mitigating evidence is both significant and clearly supported by the record. *Id.* at 493. The determination of mitigating circumstances is within the discretion of the trial court. *Rogers v. State*, 878 N.E.2d 269, 272 (Ind. Ct. App. 2007), *trans. denied*. The trial court is not obligated to explain why it did not find a factor to be significantly mitigating. *Chambliss v. State*, 746 N.E.2d 73, 78 (Ind. 2001). The sentencing court is not required to place the same value on a mitigating circumstance as does the defendant. *Beason v. State*, 690 N.E.2d 277, 283-284 (Ind. 1998).

---

has not been deterred even after having been subject to the police authority of the State and made aware of its oversight activities of its citizens." *Tunstill*[ *v. State*], 568 N.E.2d [539, 545 (Ind. 1991)]. Indiana Code § 35-38-1-7.1(d) "gives a sentencing court the flexibility to consider any factor which reflects on the defendant's character, good or bad, in addition to those expressly set out in the rest of the statute." *Id.*

767 N.E.2d at 534 (citing Ind. Code § 35-38-1-7.1(d) (subsequently amended by Pub. L. No. 71-2005, § 3 (eff. April 25, 2005; Pub L. No. 213-2005, § 3 (eff. May 11, 2005) (subsection currently appears as Ind. Code § 35-38-1-7.1(c))). Pullins points to the sentencing orders which indicate, in handwriting, for Cause Nos. 33826 and 26700 respectively: "aggravators: history of delinquent aggressive +/or violent behavior (at least 5 prior batteries, 8 adjudications, 24 complaints many of which were batteries)" and "aggravators: long history of delinquent behavior which consisted of violent + aggressive behavior. (24 Referrals most which are battery, 8 adjudications most of which are batteries + Resisting + escaping)." Appellant's Appendix Volume III at 130; Appellant's Appendix Volume IV at 131. Pullins's presentence investigation report includes eight true findings of delinquent adjudications. We conclude the court did not abuse its discretion on this basis. *See Saylor v. State*, 765 N.E.2d 535, 559 (Ind. 2002) ("Indeed, an adjudication itself may not be enough to prove a criminal history. However, 'the *acts* committed by the juvenile may constitute a criminal history to support enhancement of a sentence.' ([E]mphasis added). In this case, the record does show that a few of Saylor's juvenile offenses were dismissed and at least one was disposed of informally. However, the record also shows that Saylor engaged in a number of acts as a juvenile that would have been crimes if committed by adults. Saylor has not shown that the trial court relied improperly on his juvenile record in imposing sentence." (citations omitted)), *reh'g granted and rev'd on other grounds*, 808 N.E.2d 646 (2004); *Johnson v. State*, 837 N.E.2d 209, 215 (Ind. Ct. App. 2005) ("Johnson's criminal history, on the other hand, reveals a pattern of contempt for the law, including three felonies among nine adult convictions and seven true findings as a juvenile. We cannot say that the trial court abused its discretion by giving Johnson's criminal history significant aggravating weight."), *trans. denied*.

The Indiana Supreme Court has identified four factors "that bear on the weight, if any, that should be given to mental illness in sentencing." *Weeks v. State*, 697 N.E.2d 28, 30 (Ind. 1998) (citing *Archer v. State*, 689 N.E.2d 678, 685 (Ind. 1997)). Those factors are: (1) the extent of the defendant's inability to control his or her behavior due to the disorder or impairment; (2) overall limitations on functioning; (3) the duration of the mental illness; and (4) the extent of any nexus between the disorder or impairment and the commission of the crime. *Id.*

The Court has held there is a need for a "high level of discernment when assessing a claim that mental illness warrants mitigating weight." *Covington v. State*, 842 N.E.2d 345, 349 (Ind. 2006). In *Archer*, the Court held in part:

> In a case where the court finds that defendant, who is mentally ill but able to distinguish right from wrong and therefore not legally insane, suffers from a serious mental illness, particularly a long-standing illness, or where that defendant's visions or voices led to bizarre behavior and played an integral part in the crime, the court may decide not to impose an enhanced sentence or may decide to otherwise accord significant weight to defendant's mental illness as a mitigating factor. On the other hand, where the mental illness is less severe and defendant appears to have more control over his thoughts and actions, or where the nexus between defendant's mental illness and the commission of the crime is less clear, the court may determine on the facts of a particular case that the mental illness warrants relatively little or no weight as a mitigating factor.

689 N.E.2d at 685 (footnotes omitted). In *Anglemyer*, the defendant pled guilty to robbery and battery pursuant to an agreement that the "sentence will not

exceed sixteen (16) years executed. Each count's sentence shall run consecutive." 868 N.E.2d at 485. Accepting the agreement, the court imposed a ten-year sentence for the Class B felony conviction and a six-year sentence for the Class C felony conviction, ordered the sentences to run consecutively, and imposed a total term of sixteen years. *Id.* On appeal, the Court observed that the defendant was

> incorrect in his assertion that the trial court "overlooked" his mental illness as a mitigating factor, or in the language of our decision today, that "the sentencing statement omits [a] reason [ ]," specifically Anglemyer's mental illness, that is "supported by the record." The record shows that at sentencing Anglemyer presented to the trial court a lengthy psychological evaluation conducted on March 29, 2001 which, summarized, revealed that at age fourteen Anglemyer suffered a personality disorder characterized by symptoms of "situational stress," "depression," feelings of "guilt[ ]" and "inadequate amounts of energy." Anglemyer also presented excerpts of a psychiatric evaluation dated July 1, 2002 that noted, "Alex has a long history of emotional and behavioral problems." He was diagnosed with "Bipolar Mood Disorder," "Intermittent Explosive Disorder," and "Oppositional Defiant Disorder."

*Id.* at 493 (internal citations omitted). The Court held:

> It is apparent to us that rather than overlooking Anglemyer's mental illness, the trial court determined it was not significant and thus would not be a factor influencing the trial court's sentencing decision. This was the trial court's call. We find no error. To the extent Anglemyer complains that the trial court abused its discretion in failing to give his proffered mitigating factor greater weight, this claim is not available for appellate review.

*Id.* at 493-494.

[11]     We find *Anglemyer* instructive. The court had the opportunity to review and consider evidence regarding Pullins's mental illness, and it heard argument from Pullins's counsel at sentencing. The court's comments at sentencing demonstrate that it considered Pullins's evidence and argument regarding mental illness. We cannot say the trial court abused in discretion in sentencing Pullins.

[12]     Pullins next argues her sentence is inappropriate in light of the nature of the offenses and her character. She argues that, as a result of her untreated mental health, she was unable to effectively manage her stress and impulses when confronted with extremely difficult hardships, "finally reached her breaking point," and "responded in a way that most mentally-stable people would not." Appellant's Brief at 23. She contends her battery of D.D. is indistinguishable from other instances of domestic battery except for the permanency of his injury which was taken into account as she was charged of a level 3 felony and that, while the videos of L.D. were "undoubtedly disturbing and the emails contained statements that one would hope a parent never makes about their own child," her mental illnesses "adversely impacted her impulse control and caused her to reach out for help in unhealthy or dysfunctional ways." *Id.* at 25-26. She further argues her character cannot be separated from her mental illnesses and she has never had an opportunity to consistently engage in appropriate treatment and therapy.

[13] Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[14] Ind. Code § 35-50-2-5(b) provides that a person who commits a level 3 felony shall be imprisoned for a fixed term of between three and sixteen years with the advisory sentence being nine years. Pullins's plea agreement provided the sentences under the two causes were to be served consecutively, and she received, taking into consideration the year which the court suspended in Cause No. 26700, one year below the advisory on one count, two years above the advisory on the other count, and an aggregate sentence which was one year above the aggregate term had she received consecutive advisory sentences.

[15] Our review of the nature of the offenses reveals that Pullins struck D.D. in the face while she was a passenger in his car, struck him with her smartphone on the right side of his face with enough force that she broke the phone in the process, and caused pain and lacerations to his face and his right eye to bulge from the eye socket. After he pulled into a parking lot to call for help, she moved into the driver's seat of the vehicle, drove away, and later crashed the vehicle. As a result of his injuries, D.D. underwent two surgeries related to his eye. Less than two weeks later, Pullins obstructed the airway of her one-year-old son, L.D., and sent a video of it to D.D., his father, along with threats to

kill the child. The video depicted Pullins, standing in front of a bathroom mirror, "completely covering the mouth and nose" of a small child, and "pressing so hard with her right hand that the child's entire body weight was supported by the force of her grip against the child's face, pressing his head back against her body." Transcript Volume II at 13-14.

[16] Our review of character of the offender reveals that Pullins pled guilty pursuant to a plea agreement and that, as part of the agreement, the State dismissed charges of attempted murder and battery resulting in serious bodily injury. After she filmed herself obstructing the airway of their one-year-old son, Pullins sent D.D. a copy of the video footage along with a message stating "told you, get him," sent D.D. a second video of her suffocating the child, and sent a myriad of additional emails "saying things like, I can't wait for L.D. to die, get your baby before I kill him, he deserves to die, he has nobody, Imma just stab him, Imma just stab him to death, I'm stabbing L.D. to death tonight, I hate him, I wish you never gave him to me, I don't love him or you." *Id.* at 15. Pullins was on bond when she committed the instant offenses and was involved as a suspect in assaults while in jail in September 2018 and January 2019 where the alleged victims indicated they did not wish to prosecute. The presentence investigation ("PSI") reports reveals: Pullins's delinquent history consisted of twenty-four juvenile incidences and included eight true findings of delinquent adjudication; her adult criminal history consisted of six arrests, a guilty plea for misdemeanor theft in 2015, and an incident in May 2017 involving D.D. which resulted in charges for domestic battery committed in the presence of a child

less than sixteen years old, criminal recklessness, resisting law enforcement, and disorderly conduct; and her overall risk assessment score using the Indiana Risk Assessment System places her in the high risk to reoffend category. According to the PSI, Pullins reported first drinking alcohol and smoking marijuana in middle school and first using methamphetamine when she was seventeen years old. We recognize the evidence of Pullins's diagnoses, mental illness, and history of substance use as set forth above and in the record. After due consideration, we conclude that Pullins has not sustained her burden of establishing her aggregate sentence is inappropriate.

[17] Regarding the trial court's condition restricting Pullins's contact with any minor child, we note that at sentencing Sergeant McAllister indicated Pullins's three children were examined by medical staff and stated that "[n]one of them were gravely injured or – or hurt at that moment." *Id.* at 46. In asserting that limiting Pullins's access to minor children as a condition of her probation is in the best interest of public safety, the State does not cite authority that supports the imposition of this condition and likens Pullins to an offender convicted of child molestation. *See* Appellee's Brief at 18 (quoting *Smith v. State*, 779 N.E.2d 111, 117 (Ind. Ct. App. 2002) ("[C]hild molesters molest children to whom they have access."), *trans. denied*). It does not point to evidence demonstrating a long-term order affords necessary relief or that Pullins posed a threat to any child other than L.D. We find the condition as imposed to be overbroad and accordingly remand with instructions to delete this condition except as to L.D. *See Waters v. State*, 65 N.E.3d 613, 619 (Ind. Ct. App. 2016) (finding trial court

erred in imposing a probation condition that defendant shall have no contact with any person under the age of sixteen and noting that "without any evidence that [the defendant] poses a particular threat to children, [the probation conditions, including the aforementioned condition prohibiting contact] cannot be said to be reasonably related to the treatment of the defendant and the protection of public safety.").

[18] For the foregoing reasons, we affirm Pullins's sentences, reverse the imposition of the probation condition, and remand to delete the condition except as to L.D.

[19] Affirmed in part, reversed in part, and remanded.

Najam, J., and Kirsch, J., concur.