

FILED
Nov 05 2015, 8:20 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Donald C. Swanson, Jr.
Deputy Public Defender
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Tommy Orlando Townsend, Sr.,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

November 5, 2015

Court of Appeals Case No.
02A03-1503-CR-90

Appeal from the Allen Superior
Court

The Honorable Frances C. Gull,
Judge

Trial Court Cause No.
02D06-1404-FA-23

**Crone, Judge.**

## Case Summary

[1]     Tommy Orlando Townsend, Sr., appeals his convictions and fifty-five-year

aggregate sentence for class A felony burglary and class B felony criminal

confinement. He contends that his convictions require reversal because the jury's rejection of his insanity defense is contrary to law. He also contends that the trial court erred in giving the State's tendered instruction on demeanor evidence and refusing his own instruction on that issue. In addition, he argues that the trial court abused its discretion in sentencing him by failing to find that temporary mental illness was a mitigating circumstance. He also asserts that his sentence is inappropriate in light of the nature of the offenses and his character.

[2] We conclude that the jury properly rejected Townsend's insanity defense because there was evidence that his mental state at the time of the offenses was due to voluntary intoxication rather than a result of mental disease or defect. We also conclude that any error in instructing the jury was harmless. With regard to sentencing, we conclude that the trial court did not abuse its discretion by declining to find that temporary mental illness was a mitigating factor. Finally, we conclude that Townsend has failed to carry his burden to show that his sentence is inappropriate. Therefore, we affirm.

## Facts and Procedural History

[3] The facts most favorable to the verdicts show that in January 2014, Townsend and Zaida Ortiz separated after nineteen years of marriage. The following month, Ortiz filed for divorce. Townsend remained living at their family home, while Ortiz moved into an apartment, both in Fort Wayne. Townsend and Ortiz have two sons, who were eight and twenty-three years old at the time.

Due to the couple's estrangement, Townsend became depressed and drank regularly.

[4] In April 2014, on the Friday before Easter, the children went to stay with Townsend. That weekend Townsend was "ill." Tr. at 45-46. On Saturday night, he took 50 milligrams of Flexeril, a prescription muscle relaxant that he received from Ortiz, and one or two capsules of Dimetapp, an over-the-counter cold medicine. He also took another pill, which was unidentified.

[5] At approximately 9:30 a.m. on Easter, Ortiz finished work and returned to her apartment. She became alarmed because some of her things were strewn all over her bed, which was not how she had left it. She found Townsend hiding in her bathroom. She was not expecting him to be in her apartment. She had not given him a key to the apartment or permission for him to be there. Ortiz asked Townsend what he was doing there. He told her that they needed to talk. She told him to leave. He said that he wanted to talk about the divorce. He wanted Ortiz to call her attorney and call off the divorce. Ortiz persuaded Townsend to exit the apartment by telling him that she would be willing to talk to him outside, but after he went out she remained inside. They argued at the front door. She told him, "You're obviously not sick." *Id*. at 48. She did not think that Townsend appeared to have a cold or the flu. She started to close the door. Townsend blocked it with his foot, but she managed to close it.

[6] Ortiz called her elder son to see whether he had given Townsend a key to her apartment and left a voicemail message. Then she heard noises at the front

door and was afraid that Townsend was trying to get back in. She went to the front door. Townsend flung the door open and punched her in the head. Her phone flew across the room. Townsend came at her with a knife, and she started screaming. Townsend told her that she should have called the attorney and stopped the divorce as he had told her to do. He grabbed Ortiz and slammed her to the ground. She felt him hit her three times in the back, and "it hurt so bad [she] could barely breathe." *Id*. at 50. Townsend flipped her over. He got on top of her, held her down, and stabbed her in the chest. At that point she realized that he had stabbed her in the back. Townsend put his hand over her mouth and nose and said, "[D]ie bitch die." *Id*. Ortiz could not breathe.

[7] Townsend got up and said, "[O]h my God. What did I do? What did I do? [… ] you need to help me. You need to help me." *Id*. at 51. Ortiz was still lying on the floor. She told Townsend to call 911. He pretended to call the EMS. He went into the kitchen. Ortiz tried to stand up and walk to the front door, but she fell down. Townsend picked her up and put her back where she had been. She saw blood on the carpet and watched as Townsend tried to clean it with bleach. She wondered why it was taking so long for the EMS to arrive. She asked Townsend if he had really called the EMS. He had not, but he told her that he had. *Id*. at 52.

[8] Townsend offered to take Ortiz to the hospital, and she agreed. He took her outside and put her in the front passenger seat of his Yukon. She looked for someone to help her, but saw no one. Townsend drove away. He told Ortiz that he did not have enough gas. She gave him her debit card, and he stopped

for gas. Townsend then drove Ortiz to their family home and parked the Yukon in the garage so that the passenger door was so close to the wall that Ortiz could not open it. Townsend went inside the house. Ortiz was afraid that he was going to kiss their younger son goodbye and then kill her and kill himself. She saw her cell phone, grabbed it, and called 911. She told the operator that she had been stabbed, needed help, and was in a tan Yukon. That was all she was able to say before Townsend came back and grabbed the phone.

[9] Townsend drove away. Ortiz began to go in and out of consciousness. She thought that Townsend appeared to be driving toward Decatur, Indiana. At one point, Townsend stopped the car so that she could urinate. Townsend then dressed the knife wounds in her back with bandages that were in a first-aid kit. He did not have enough bandages for the chest wound, so Ortiz held a towel over it.

[10] They drove on. Ortiz started to suspect that Townsend was driving to Piqua, Ohio, about a two hours away, because he had family there. Townsend made at least four more stops: when he asked for directions; when Ortiz lost control of her bowel; when Townsend got her a drink; and when she woke up vomiting. Ortiz, a registered nurse, believed that she was going into shock. She kept asking Townsend to take her to the hospital, but he did not.

[11] Ortiz asked Townsend to take her to his uncle, Richard King, who lived in Piqua. Townsend drove by King's house several times. At around 5:00 p.m., King had arrived home, and he saw Townsend pull up. King asked Townsend

what he was doing there, but Townsend drove away. Townsend immediately returned, and King asked what was going on. King realized that Ortiz was in the Yukon with Townsend. King went over to the passenger side to talk to Ortiz and saw a little bit of blood. King asked Townsend what was going on, but Townsend was unresponsive. Townsend drove away again but returned. King again asked Townsend what was going on, and Townsend still did not respond. King looked at Ortiz, who shook her head. King told Townsend to let Ortiz out of the car so that King could take her to the hospital. Townsend eventually agreed, and King rushed her to the hospital. Ortiz had to be transferred to a hospital with a trauma center due to her critical condition. Ortiz had three stab wounds to her back and one to her chest. She also had a cut on her hand from trying to defend herself.

[12] Townsend did not follow King to the hospital. Police found Townsend around 5:47 p.m. He had crashed his Yukon and was unresponsive. The Yukon was still running, so the officer opened the passenger door to turn the vehicle off and a box of Sleepinal pills fell out. *Id*. at 131.

[13] The State charged Townsend with class A felony burglary, class B felony aggravated battery, class B felony criminal confinement, and class C felony intimidation. Townsend filed a notice of intent to offer an insanity defense. The trial court appointed Drs. Rebecca Mueller and Stephen Ross to provide expert testimony on whether Townsend was legally insane when he committed the offenses. Both interviewed Townsend in July 2014.

[14]   A two-day jury trial was held.  Dr. Mueller testified that when she interviewed Townsend he was experiencing some short-term memory loss.  Townsend told her that the night before he committed the offenses he took a Flexeril pill that he got from Ortiz, one or two Dimetapp capsules, and "another pill that he described as not being Flexeril." *Id.* at 225.  Dr. Mueller testified that she "later found out that he had taken more Flexeril than he realized.  He had taken probably 50 mg. of Flexeril the night before." *Id.*  The therapeutic dose of Flexeril is 15 to 30 milligrams in a 24-hour period. *Id.* at 227.  Dr. Mueller concluded that Townsend was legally insane at the time of the offenses.  *Id.* at 216.  Specifically, she concluded that he suffered anticholinergic intoxication with secondary psychosis as a result of "[v]arying kinds of medications." *Id.* at 216, 233-34.  Dr. Mueller explained that psychosis generally means "a break from reality" where a person does not "perceive things as they are truly happening." *Id.* at 220.  She testified that any psychosis that Townsend had was a result of the medication and that all the information available to her showed that he took the medicines voluntarily. *Id.* at 234-35.  She further testified that Townsend's depression from his divorce probably contributed to "some poor judgment about taking too much medication." *Id.* at 274.  She also testified that Townsend did not have a history of psychosis and that he had no memory of the events after he took the medication until he woke up two days later chained to a hospital bed.

[15]   Dr. Ross testified that Townsend was psychotic at the time of the offense, related to the "voluntary consumption of medications." *Id.* at 282.  He also

testified that Townsend was unable to appreciate the wrongfulness of his conduct at the time of the offense. *Id.* at 303.

[16] The State requested a jury instruction informing the jury that it could consider Townsend's demeanor before, during, and after the crime to determine whether he was legally insane because his demeanor might be more indicative of his mental health than mental exams conducted weeks or months later ("the State's Demeanor Instruction"). Appellant's App. at 71 (State's Proposed Instruction No. 8); Tr. at 195-96. Townsend objected that the State's Demeanor Instruction was already covered by other instructions, invaded the province of the jury, was unsupported by the evidence, and was confusing. The trial court gave the State's Demeanor Instruction over Townsend's objection.

[17] Townsend also requested a jury instruction on demeanor evidence ("Townsend's Demeanor Instruction"), which stated that demeanor evidence before and after the crime was of more limited probative value than demeanor evidence during the crime. Appellant's App. at 84 (Defendant's Proposed Instruction No. 6). The State conceded that it was an accurate statement of the law and did not object to it, but the trial court refused it on the grounds that it was already covered by other instructions. Tr. at 201-02.

[18] The trial court also instructed the jury that temporary mental incapacity produced by voluntary intoxication is not an excuse for a crime, and that such temporary mental incapacity is not considered a mental disease or defect under Indiana's insanity statute. Appellant's App. at 47. During deliberations, the

jury sent the foreman out with a note asking whether voluntary intoxication was the same as voluntary consumption. Tr. at 367. The trial court directed the jury to rely on the evidence and the court's instructions.

[19] The jury found Townsend guilty as charged. The trial court entered judgment of conviction for class A felony burglary and class B felony criminal confinement and vacated the remaining counts to avoid double jeopardy.[1] The trial court sentenced Townsend to consecutive terms of forty years for burglary and fifteen years for criminal confinement, for an aggregate term of fifty-five years. Townsend appeals.

## Discussion and Decision

## Section 1 - The jury's decision to reject Townsend's insanity defense was not contrary to law.

[20] The insanity defense is an affirmative defense for which the defendant carries the burden of proof by a preponderance of the evidence. Ind. Code § 35-41-4-1(b). A defendant may be found not responsible by reason of insanity if the defendant establishes *both* that (1) he suffers from a mental disease or defect *and* (2) the mental disease or defect rendered the defendant unable to appreciate the wrongfulness of his conduct at the time of the offense. Ind. Code § 35-41-3-

---

[1] When judgment of conviction is not entered on the jury's verdict, it is unnecessary to vacate the verdict. "[A] claim of multiple punishment for the same offense requires multiple judgments of conviction, entered by the trial court." *Carter v. State*, 750 N.E.2d 778, 781 n.8 (Ind. 2001). In fact, "more harm than good may result if a trial court 'vacates' a jury verdict not reduced to judgment. If a conviction for a greater offense is reversed … a conviction for the lesser offense may remain valid." *Id*. at 781 n.9.

6(a); *Galloway v. State*, 938 N.E.2d 699, 708 (Ind. 2010). "'[M]ental disease or defect' means a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or antisocial conduct." Ind. Code § 35-41-3-6(b).

"'A determination of insanity is a question for the trier of fact.'" *Berry v. State*, 969 N.E.2d 35, 38 (Ind. 2012) (quoting *Gambill v. State*, 675 N.E.2d 668, 672 (Ind. 1996)). A defendant who claims that his insanity defense should have prevailed at trial appeals from a negative judgment, and "we will reverse only when the evidence is *without conflict* and leads only to the conclusion that the defendant was insane when the crime was committed." *Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004) (emphasis added). We will neither reweigh the evidence nor assess witness credibility but will consider "only the evidence most favorable to the judgment and the reasonable and logical inferences drawn therefrom." *Id*.

As noted above, Townsend had the burden of proving both that he had a mental disease or defect and that as a result he did not appreciate the wrongfulness of his conduct at the time of the offenses. As for mental disease or defect, the State argues that the jury properly rejected Townsend's insanity defense because "any mental defect was caused by his voluntary intoxication." Appellee's Br. at 23. "'Temporary mental incapacity, when induced by voluntary intoxication, normally furnishes no legal excuse for, or defense to, a crime.'" *Berry*, 969 N.E.2d at 38 (quoting *Jackson v. State*, 273 Ind. 49, 52, 402

N.E.2d 947, 949 (1980)).  Indiana Code Section 35-41-2-5 provides, "Intoxication is not a defense in a prosecution for an offense and may not be taken into consideration in determining the existence of a mental state that is an element of the offense unless the defendant meets the requirements of IC 35-41-3-5."  Indiana Code Section 35-41-3-5 provides, to establish involuntary intoxication, a defendant must establish that "the intoxication resulted from the introduction of a substance into his body:  (1) without his consent; or (2) when he did not know that the substance might cause intoxication."  "Involuntary intoxication is a defense to the crime charged if, as a result of the intoxication, the defendant was unable to appreciate the wrongfulness of the conduct at the time of the offense."  *Ellis v. State*, 736 N.E.2d 731, 734 (Ind. 2000).  Involuntary intoxication is a defense that negates culpability for the committed offenses.  *Id.*

[23]     Townsend counters that he never claimed that he was involuntarily intoxicated but that he was legally insane.  Nevertheless, he bore the burden of proving that he was legally insane and therefore bore the burden of proving that he had a mental disease or defect.  Mental disease or defect, for purposes of the insanity statute, does *not* include temporary mental incapacity that results from voluntary intoxication.[2]  *Berry*, 969 N.E.2d at 42.  We observe that the jury was

---

[2]  However, "Indiana recognizes situations where 'the ingestion of intoxicants, though voluntary, has been abused to the point that it has produced mental disease.'"  *Berry*, 969 N.E.2d at 42 (quoting *Jackson*, 273 Ind. at 52, 402 N.E.2d at 949).  For example, "settled" or "fixed" insanity resulting from chronic and severe alcohol abuse is a type of mental disease as defined by Indiana Code Section 35-41-3-6(b).  *Id.*

instructed on voluntary intoxication as follows: "Temporary mental incapacity produced by voluntary intoxication is not an excuse for a crime. In other words, that sort of temporary mental incapacity is not considered a mental disease or defect under Indiana's insanity statute." Appellant's App. at 47. "The intersection of voluntary intoxication and insanity is murky at best." *Berry,* 969 N.E.2d at 42. "Ultimately, it is for the trier of fact 'to determine whether the accused's conduct was the result of a diseased mind–regardless of the source of the disease–or was the result of voluntary intoxication.'" *Id.* at 43 (quoting *Jackson*, 273 Ind. at 52, 402 N.E.2d at 949). To succeed on appeal, Townsend must show that the evidence is without conflict and leads only to the conclusion that his mental state at the time he committed the offenses was not the result of voluntary intoxication.

[24] Here, Dr. Mueller concluded that Townsend was legally insane at the time that he committed the offenses. Tr. at 216. Specifically, she concluded that he suffered anticholinergic intoxication with secondary psychosis as a result of medications, which he voluntarily took. *Id.* at 216, 234-35. Dr. Ross concluded that Townsend was psychotic at the time of his crimes related to voluntary consumption of medications. *Id.* at 282. Thus, while both experts agreed that Townsend was suffering from psychosis at the time he committed the offenses, they also both agreed that his psychosis was caused by his voluntary consumption of medications. There is no question that Townsend knowingly and voluntarily took at least two different medications, Flexeril and Dimetapp. Significantly, the Flexeril was a prescription drug for which *he did*

*not have a prescription*, and he mixed it with at least one other drug. Although Ortiz testified that she learned that Townsend was "ill" on Friday night when the children went to go stay with him, i*d.* at 45-46, there is no evidence as to why Townsend was taking a muscle relaxant. Presumably, he took the Dimetapp for cold and/or flu symptoms, but a trier of fact could reasonably question why he would take a muscle relaxant for a cold. From the evidence presented, the jury reasonably could have concluded that Townsend's mental state at the time of the offenses was a result of his voluntary intoxication. Accordingly, we conclude that the evidence as to Townsend's insanity was not without conflict, and we find no grounds for reversal on this basis.

## Section 2 - Any error in instructing the jury was harmless.

Townsend also argues that the trial court erred in giving the State's Demeanor Instruction without also giving Townsend's Demeanor Instruction. Our standard of review is well settled.

> When reviewing a trial court's decision to give or refuse to give a party's tendered instruction, we consider (1) whether the tendered instruction correctly states the law; (2) whether there was evidence presented at trial to support giving the instruction; and, (3) whether the substance of the instruction was covered by other instructions that were given. The trial court has broad discretion as to how to instruct the jury, and we generally review that discretion only for abuse. Where, however, … the appellant's challenge to the instruction is based on the first of our three considerations–an argument that the instruction was an incorrect statement of the law–we review the trial court's interpretation of that law de novo.

*Kane v. State*, 976 N.E.2d 1228, 1230-31 (Ind. 2012) (citations and quotation marks omitted).

[26] "A defendant is entitled to a reversal if he affirmatively demonstrates that the instructional error prejudiced his substantial rights." *Vaughn v. State*, 13 N.E.3d 873, 884 (Ind. Ct. App. 2014), *trans. denied*. "Instructional error is harmless 'where a conviction is clearly sustained by the evidence and the jury could not properly have found otherwise' but 'will result in reversal when the reviewing court cannot say with complete confidence that a reasonable jury would have rendered a guilty verdict had the instruction not been given.'" *Inman v. State*, 4 N.E.3d 190, 200 (Ind. 2014) (quoting *Dill v. State*, 741 N.E.2d 1230, 1233 (Ind. 2001)).

[27] The State's Demeanor Instruction read,

> A finding that a defendant was sane at the time of the crime may be sustained by probative demeanor evidence from which a conflicting inference of sanity may be drawn. Demeanor is useful because a defendant's behavior before, during, and after a crime may be more indicative of actual mental health at the time of the crime than mental exams conducted weeks or months later.

Appellant's App. at 48. Townsend's Demeanor Instruction read, "Demeanor evidence before and after a crime is of more limited value than the accused['s] demeanor during the crime. The insanity defense concerns the accused's mental state at the time of the crime. *Id*. at 84.

[28] Both the State's and Townsend's Demeanor Instructions are taken from *Galloway*, 938 N.E.2d at 712, 174, and address evidence pertaining to whether Townsend appreciated the wrongfulness of his actions at the time of the offenses. We have already concluded that there was sufficient evidence upon which the jury could reasonably find that, as a result of Townsend's voluntary intoxication, he was not suffering from a mental disease or defect. Given the substantial evidence of Townsend's voluntary intoxication, we can say with complete confidence that a reasonable jury would have rendered a guilty verdict had the trial court agreed to give both instructions or refused to give either instruction. Therefore, assuming, without deciding, that the trial court erred in giving the State's Demeanor Instruction and refusing Townsend's Demeanor Instruction, that error did not prejudice Townsend's substantial rights. Accordingly, we conclude that any possible error was harmless and does not require reversal.

## Section 3 – The trial court did not abuse its discretion by not finding that temporary insanity was a mitigating circumstance.

[29] At sentencing, the trial court found that Townsend's criminal history, failed efforts at rehabilitation, and the nature and circumstances of the crimes were aggravating circumstances and that his clinical depression, long-term employment, and remorse were mitigating factors. The trial court found that the aggravators outweighed the mitigators and sentenced Townsend to

consecutive terms of forty years for burglary and fifteen years for criminal confinement, for an aggregate term of fifty-five years.

[30] Townsend asserts that the trial court should have found that his temporary insanity was a mitigating factor. We observe that

> the determination of mitigating circumstances is within the discretion of the trial court. The trial court is not obligated to accept the defendant's argument as to what constitutes a mitigating factor, and a trial court is not required to give the same weight to proffered mitigating factors as does a defendant. A trial court does not err in failing to find a mitigating factor where that claim is highly disputable in nature, weight, or significance. An allegation that a trial court abused its discretion by failing to identify or find a mitigating factor requires the defendant on appeal to establish that the mitigating evidence is significant and clearly supported by the record.

*Healey v. State*, 969 N.E.2d 607, 616 (Ind. Ct. App. 2012) (citations omitted), *trans. denied*.

[31] Mental illness is not necessarily a significant mitigating factor; "rather, [it] is a mitigating factor to be used in certain circumstances, such as when the evidence demonstrates longstanding mental health issues or when the jury finds that a defendant is mentally ill." *Ousley v. State*, 807 N.E.2d 758, 762 (Ind. Ct. App. 2004) (referring to *Crawford v. State*, 770 N.E.2d 775, 782-83 (Ind. 2002); *Gambill*, 675 N.E.2d at 668; *Biehl v. State*, 738 N.E.2d 337, 340 (Ind. Ct. App. 2000), *trans. denied*). Here, the trial court found that Townsend's depression was a mitigating factor, but Townsend challenges its refusal to give mitigating

weight to the temporary psychosis caused by the medications he took. We note that the jury rejected his insanity defense, and it also declined to find him guilty but mentally ill. Further, there is no evidence that Townsend's psychosis was a symptom of a longstanding mental illness. We conclude that the trial court did not abuse its discretion by declining to find that temporary insanity was a mitigating factor.

## Section 4 – Townsend has failed to carry his burden to show that his sentence is inappropriate.

[32] Finally, Townsend contends that his fifty-five-year sentence is inappropriate under Indiana Appellate Rule 7(B), which provides, "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The nature of the offense is found in the details and circumstances of the commission of the offense. *Croy v. State*, 953 N.E.2d 660, 664 (Ind. Ct. App. 2011). The character of the offender shown by the offender's life and conduct. *Id*. When reviewing a sentence, our principal role is to leaven the outliers rather than necessarily achieve what is perceived as the correct result. *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). "We do not look to determine if the sentence was appropriate; instead we look to make sure the sentence was not inappropriate." *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). Townsend bears the burden to show that his sentence is inappropriate. *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218.

[33] Turning first to the nature of the offense, we observe that "the advisory sentence is the starting point the Legislature selected as appropriate for the crime committed." *Pierce v. State*, 949 N.E.2d 349, 352 (Ind. 2011). Townsend was convicted of class A felony burglary and class B felony criminal confinement. The sentencing range for a class A felony is between twenty and fifty years, with an advisory sentence of thirty years. Ind. Code § 35-50-2-4. The sentencing range for a class B felony is between six and twenty years, with an advisory sentence of ten years. Ind. Code § 35-50-2-5. The trial court sentenced Townsend to consecutive terms of forty years for the class A felony and fifteen years for the class B felony.

[34] Here, Townsend entered Ortiz's apartment without her permission, and was lying in wait for her. Then, he refused to leave when she asked him to. When she refused to do as he asked, he stabbed her four times. He also put his hand over her mouth and told her, "[D]ie bitch die." Tr. at 50. He pretended to call for help and claimed that he had called for help even though he had not. He did not take her to get medical attention. Instead, he kept her in his car for some seven hours, letting her suffer and preventing her from receiving medical care. These circumstances are more egregious than what is necessary to commit class A felony burglary and class B felony criminal confinement.[3]

---

[3] Class A felony burglary is defined as breaking and entering the building or structure of another person with intent to commit a felony in it and it results in bodily injury or serious bodily injury. Ind. Code § 35-43-2-1. Class B felony criminal confinement is defined as knowingly or intentionally confining another person without the person's consent while armed with a deadly weapon. Ind. Code § 35-42-3-3.

[35] As for Townsend's character, his long-term employment and financial support of his family are favorable. He was convicted of battery, criminal recklessness, and criminal mischief over twenty years ago. Nevertheless, that battery conviction, like this one, involved an incident of domestic violence. We conclude that Townsend has failed to carry his burden to show that his fifty-five-year sentence is inappropriate based on the nature of the offenses and his character.

[36] Based on the foregoing, we affirm Townsend's convictions and sentence.

[37] Affirmed.

May, J., and Bradford, J., concur.