## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 23 2020, 9:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kyle E. Cray
Bennett Boehning & Clary LLP
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Daniel M. Krum,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

September 23, 2020

Court of Appeals Case No.
20A-CR-115

Appeal from the Tippecanoe
Superior Court

The Honorable Kristen E. McVey,
Judge

Trial Court Cause No.
79D05-1901-F6-22

**Pyle, Judge.**

# Statement of the Case

Daniel Krum ("Krum") appeals the sentence imposed after he was convicted in a bench trial of: (1) Class B misdemeanor harassment;[1] (2) three counts of Class A misdemeanor invasion of privacy;[2] and (3) Level 6 felony invasion of privacy.[3] He specifically argues that the trial court abused its discretion in sentencing him because it declined to consider his mental health to be a mitigating factor. Finding no abuse of the trial court's discretion, we affirm Krum's sentence.

We affirm.

# Issue

Whether the trial court abused its discretion in sentencing Krum.

# Facts

In January 2017, the trial court issued a protective order ("the Protective Order") that "prohibited [Krum] from harassing, annoying, telephoning, contacting, or directly or indirectly communicating with [the victim, ("the

---

[1] IND. CODE § 35-45-2-2(a)(2).

[2] I.C. § 35-46-1-15.1.

[3] I.C. § 35-46-1-15.1.

Victim") who is the mother of his two children]."[4] (Ex. Vol. 2 at 60). The day that Krum was served with the Protective Order, Krum telephoned the Victim and left three voicemails that were unrelated to parenting time with their daughter. In one of the voicemails, Krum stated, in relevant part, as follows:

> Hey, it's me Dan Krum, and I have to say are you fucking serious. Really? This is not a game, everyone loses. You need to get some fucking help now, I care about you so much that I want to help you, but you need to go get some help. Convincing [our son] to sign this restraining order against me, fuck you. You are fucked up and you need help. I've helped you more than anyone else in your life and you do not give a fuck about me[.] You have no clue that you need to change and when you get old you will be miserable by your fucking self and dying lonely. I will not so I tried as hard as I could. Un-fucking believable restraining order with like special shit, wow. Un-fucking believable.

(Tr. Vol. 2 at 35-36).

[4] Krum continued to violate the Protective Order in February, March, and May 2017 by texting the Victim, telephoning her, and leaving her similar voicemails. The texts and voicemails were unrelated to parenting time with their daughter. For example, in February 2017, Krum left another voicemail that provides, in relevant part, as follows:

---

[4] Krum was allowed to text the victim regarding parenting time with their daughter. Krum and the victim also have an adult son.

Yes – no contact by phone, cannot talk to any of your family members, I'm trespassed from your residence and your complex. And (inaudible) and the school. Really? You record everything I say, but again its's not a game at all. All I want is to take care of this in a peaceful manner but you don't even want to talk to me and you coerced [our son] into whatever he did. So are you really happy in your life? Do you really imagine that jail is going to bother me? It won't. So, when [our children] figure out what the fucking problem is, I'm sorry for you[.] Everything I did for you is because I care about you and you treated me like shit. All you wanted was a daughter, you don't give one fuck about [our son]. I was helping him and you didn't like it. You could not even fucking communicate so you are the one that has the problem. My location is on if you want . . the cops to come and arrest me now.

(Tr. Vol. 2 at 42-43).

[5] In January 2019, the State charged Krum with the following nine counts: (1) Class B misdemeanor harassment for communicating with the victim with the intent to harass, annoy, or alarm her in January 2017 before the Protective Order was issued; (2) Class A misdemeanor invasion of privacy for violating the Protective Order in January 2017; (3) Class A misdemeanor invasion of privacy for violating the Protective Order in February 2017; (4) Class A misdemeanor invasion of privacy for violating the Protective Order in March 2017; (5) Class A misdemeanor invasion of privacy for violating the Protective Order in May 2017; (6) Level 6 felony invasion of privacy for violating the Protective Order in January 2017 while having a prior unrelated conviction for invasion of privacy; (7) Level 6 felony invasion of privacy for violating the Protective Order in February 2017 while having a prior unrelated conviction for invasion of

privacy; (8) Level 6 felony invasion of privacy for violating the Protective Order in March 2017 while having a prior unrelated conviction for invasion of privacy; and (9) Level 6 felony invasion of privacy for violating the Protective Order in May 2017 while having a prior unrelated conviction for invasion of privacy.

[6] In April 2019, Krum filed a motion requesting that the trial court appoint two psychiatrists or psychologists to examine him and evaluate his competency to stand trial. The trial court granted the motion in May 2019 and appointed Dr. Sean Samuels ("Dr. Samuels") and Dr. Aaron Kivisto ("Dr. Kivisto"), both psychologists, to examine Krum.

[7] In November 2019, after both psychologists had examined Krum, the trial court held a competency hearing. Dr. Samuels, who used a standardized semi-structured interview approach to assess Krum's competency, concluded that Krum was competent to stand trial. Dr. Samuels specifically found that Krum was able to factually and rationally understand the legal proceedings and was capable of assisting his defense counsel. Dr. Samuels further explained as follows during direct examination:

> [Krum] initially presented . . . being verbally aggressive, irritated and continued to maintain that tone when he discussed the charges against him[.] Having said that, after probably forty-five minutes of cathartic expression, he was able to calm down, stay focused, and answer questions. By the end of our time together[,] he was showing me pictures of several of the cars that he's restored and he's very proud of that.

(Supp. Tr. 26).

[8] In his written report, Dr. Samuels further explained as follows:

> Historical information indicates Mr. Krum demonstrates a pattern of aggressive communication when he does not feel his needs are being met or if he believes he is not being treated with the respect he deserves. It is hypothesized his demonstration of loud, pressured speech marked by a swearing and an aggressive tone is a tool Mr. Krum purposefully implements to obtain his goals.

(App. Vol. 2 at 67). Dr. Samuels did not diagnose Krum with a mental illness.

[9] On the other hand, Dr. Kivisto, who did not use a standardized tool to evaluate Krum's competency, concluded that Krum was not competent to stand trial. Dr. Kivisto specifically explained that as a result of Krum's "intense irritability that was tangential really distractible thinking, an inflated sense of self, pressure speech on the interview," it was Dr. Kivisto's "opinion that while [Krum] had a roughly accurate factual understanding of the proceedings against him in terms of his ability to rationally approach the material of his case[,]" Krum had "some substantial impairments." (Supp. Tr. 17). Based on these impairments, Dr. Kivisto "had some concerns regarding his capacity to work with defense counsel in a rationale way." (Supp. Tr. 18). Dr. Kivisto also diagnosed Krum with "bipolar two disorder." (Supp. Tr. 19).

[10] Also at the hearing, the parties stipulated that Krum had represented himself in a child visitation hearing the previous month. The purpose of the hearing was to discuss visitation and child support. Krum had been able to follow the

proceedings and respond appropriately to questions that were asked of him. He had also cross-examined the Victim. After hearing the evidence, the trial court concluded that Krum was competent to stand trial.

[11] At Krum's December 2019 bench trial, the State presented evidence that Krum had violated the Protective Order in January, February, March, and May 2017 by texting the Victim and leaving her voicemails that did not relate to parenting time with his daughter. Krum frequently disrupted the trial by making loud comments. At one point, he called a detective a "douche bag" as he was leaving the courtroom after testifying. (Tr. Vol. 2 at 127).

[12] Krum testified at trial and admitted that many of his texts and voicemails violated the Protective Order. At one point, Krum testified as follows: "I'm not going to say I apologize. I'm going to apologize but I'm not sorry for anything." (Tr. Vol. 2 at 109). There was no testimony at trial that Krum had a history of mental illness or hospitalizations. There was also no testimony that Krum had mental health issues that rendered him unable to control his behavior or that limited his functioning. In addition, there was no testimony that there was a nexus between his alleged mental health issues and the crimes that he had committed. After hearing the evidence, the trial court convicted Krum of all nine counts.

[13] Testimony at the sentencing hearing revealed that Krum has six prior misdemeanor convictions. Again, there was no testimony at the sentencing hearing that Krum had a history of mental illness or hospitalizations. There

was also no testimony that Krum had mental health issues that rendered him unable to control his behavior or that limited his functioning. In addition, there was no testimony concerning a nexus between Krum's alleged mental health issues and the crimes that he had committed. However, defense counsel asked the trial court to consider Krum's "mental health issues" as a mitigating factor. (Tr. Vol. 2 at 129). After hearing testimony, the trial court gave the following sentencing statement:

> I'm entering judgment on counts one, three, four, five, and six[.] I find as aggravating factors the defendant[']s history of delinquent behavior, however not a strong, not a lot of weight on that aggravating circumstance. The repeated nature of the contact that was impermissible in the sense that it goes well beyond what was necessary to constitute the elements of the crime[s]. Most significantly, however, is the lack of remorse, the attitude that it's everyone else's fault. That he's – that Mr. Krum, that you[']re smarter, that you know everything more than anyone else, that you're not wrong. The insincerity of the attempts to apologize[.] Your attitude about it is most significantly a concern to me. I don't find mitigating factors. I . . . impose sentences of 180 days for count [one], 365 days on each of counts three, four, and five. 730 days for count six, however I'm going to . . . order that counts three, four, and five run concurrently to one another but consecutively to counts one and six.

(Tr. Vol. 2 at 130-31). The total aggregate sentence was 1275 days in the county jail.

[14]   Krum now appeals his sentence.

# Decision

Krum argues that the trial court abused its discretion in sentencing him. Sentencing decisions rest within the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007). So long as the sentence is in the statutory range, it is subject to review only for an abuse of discretion. *Id.* An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* at 491. A trial court may abuse its discretion in a number of ways, including: (1) failing to enter a sentencing statement at all; (2) entering a sentencing statement that includes aggravating and mitigating factors that are unsupported by the record; (3) entering a sentencing statement that omits reasons that are clearly supported by the record; or (4) entering a sentencing statement that includes reasons that are improper as a matter of law. *Id.* at 490-91.

Here, Krum's sole argument is that the trial court abused its discretion when it failed to consider his mental health to be a mitigating factor. A finding of a mitigating factor is not mandatory but is within the discretion of the trial court. *Page v. State*, 878 N.E.2d 404, 408 (Ind. Ct. App. 2007), *trans. denied*. In order to show that the trial court abused its discretion in failing to find a mitigating factor, the defendant must establish that the mitigating evidence is both significant and clearly supported by the record. *Rogers v. State*, 958 N.E.2d 4, 9 (Ind. Ct. App. 2011). "Mental illness is not necessarily a significant mitigating factor, 'rather [it] is a mitigating factor to be used in certain circumstances, such

as when the evidence demonstrates longstanding mental health issues or when the jury finds that a defendant is mentally ill.'" *Townsend v. State*, 45 N.E.3d 821, 831 (Ind. Ct. App. 2015) (quoting, *Ousley v. State*, 807 N.E.2d 758, 762 (Ind. Ct. App. 2004)), *trans. denied*.

[17] The Indiana Supreme Court has held that there is "the need for a high level of discernment when assessing a claim that mental illness warrants mitigating weight." *Covington v. State*, 842 N.E.2d 345, 349 (Ind. 2006). In *Archer v. State*, 689 N.E.2d 678, 683 (Ind. 1997), the Indiana Supreme Court identified several factors that bear on the weight, if any, that should be given to mental illness in sentencing. These factors include: (1) the extent of the defendant's inability to control his behavior due to the disorder or impairment; (2) the overall limitations on functioning; (3) the duration of the illness; and (4) the extent of any nexus between the disorder or impairment and the crime. *Id.* at 685.

[18] For example, in *Weeks v. State*, 697 N.E.2d 28 (Ind. 1998), Weeks was charged with murder, and a jury found him to be guilty but mentally ill. The trial court found no mitigating factors and sentenced Weeks to the maximum sentence of sixty (60) years. On appeal, Weeks argued that the trial court had erred in declining to consider his mental illness to be a mitigating factor. The Indiana Supreme Court applied the *Archer* factors and concluded that the trial court had erred in declining to consider Weeks' history of mental illness to be a mitigating factor. *Id.* at 30-31. Specifically, our supreme court first noted that the jury's verdict had been guilty but mentally ill. *Id.* at 31. The Supreme Court also noted that that the uncontradicted evidence showed that Weeks had a six-year

history of mental illness and had been diagnosed with a range of disorders, including schizophrenia, schizo-affective disorder, and bipolar disorder. *Id.* Weeks had also been "in and out of hospitals" and had previously demonstrated an "inability to control his impulses." *Id.* For example, eight months before the crime, Weeks ran out of gas on Interstate 65 near Indianapolis. Police found him standing near his car on the side of the freeway, mumbling about "black gashes of cancer" in the vehicle. *Id.* In addition, two years before the crime, he was involuntarily hospitalized after he threatened to "blow away" his parents with a shotgun. *Id.*

[19] However, the facts before us are distinguishable from those in *Weeks*. Here, the trial court found that Krum was guilty, not guilty but mentally ill. In addition, there was no evidence presented either at trial or at the sentencing hearing that Krum had a history of mental illness or had ever been hospitalized. There was also no evidence that Krum had been unable to control his behavior due to having mental health issues or that mental health issues had limited his functioning. Rather, Dr. Samuels' competency evaluation of Krum stated that Krum's "demonstration of loud, pressured speech marked by a swearing and an aggressive tone [was] a tool Mr. Krum purposefully implement[ed] to obtain his goals." (App. Vol. 2 at 67). Dr. Samuels did not diagnose Krum with a mental illness. The trial court did not abuse its discretion in declining to consider Krum's mental health issues as a mitigating factor.

[20] We further note that even if the trial court had abused its discretion by declining to find Krum's mental health to be a mitigating factor, any error was harmless.

When the trial court abuses its discretion in sentencing, we will remand if we cannot say with confidence that the trial court would have imposed the same sentence. *Webb v. State*, 941 N.E.2d 1082, 1090 (Ind. Ct. App. 2011), *trans. denied*. Here, the trial court found the following aggravating factors: (1) Krum's prior criminal history, which included six misdemeanor convictions; (2) the repeated nature of Krum's contact, which went well beyond what was necessary to constitute the elements of the offenses; and (3) Krum's lack of remorse and attitude. Because of the presence of these significant aggravating factors, we conclude that the trial court would have imposed the same sentence even if it would have found Krum's mental health to be a mitigating factor. *See Scott v. State*, 840 N.E.2d 376, 384 (Ind. Ct. App. 2006) (holding that although the trial court erred in failing to find the defendant's mental illness to be a mitigating factor, the error was harmless in light of multiple valid aggravating factors), *trans. denied*.

[21] Affirmed.

Kirsch, J., and Tavitas, J., concur.