## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 15 2020, 9:08 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Matthew D. Anglemeyer
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tiffany A. McCoy
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Dewayne Harris, *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff.* | December 15, 2020 <br><br> Court of Appeals Case No. 19A-CR-2681 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Barbara Crawford, Judge <br><br> Trial Court Cause No. 49G01-1710-MR-38458 |

**Altice, Judge.**

# Case Summary

[1] Dewayne Harris appeals his conviction for Murder, a felony, claiming that the trial court abused its discretion in excluding the victim's toxicology report from evidence, and that it erred in admitting photographs of items that police officers seized during the search of a residence. Harris also argues that the fifty-five year sentence for murder and the twenty-year enhancement for the use of a firearm in the crime amounted to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution because it was a *de facto* life sentence. Harris further contends that the seventy-five-year aggregate sentence was inappropriate when considering the nature of the offense and his character.

[2] We affirm the trial court's judgment but remand for a correction of the sentencing order because the trial court's oral statement at sentencing conflicted with the written sentencing order and abstract of judgment.

# Facts and Procedural History

[3] On September 29, 2017, several individuals were playing a dice game outside a residence on 28th Street in Indianapolis. Ebony Holifield was watching the game and noticed that seventeen-year-old Harris, a/k/a "Bruh Bruh," was one of the participants. *Transcript Vol. II* at 139-40.

[4] Shortly after 6:00 p.m., James Butler approached the area and sold some marijuana to one of the residents at the 28th Street house. Thereafter, several of the dice players urged Butler to join the game. Some of them chided Butler for refusing to play and accused him of being "broke." *Id.* at 146. In response, Butler pulled out "a lot of money," waved it at the group, and responded, "who's broke?" *Id.* at 146.

[5] After Butler displayed the money, Holifield saw Harris look at his brother to "get [his] attention." *Id.* at 148-49. Butler started to walk away, and Harris followed. Holifield thought she observed the outline of a gun through Butler's clothing but did not actually see a weapon. Holifield then saw Harris draw a gun, point it at Butler's back, and demand his money. Holifield never saw whether Butler drew a gun, as she was scared and began to run from the scene. She then heard several gunshots and upon returning a few minutes later, she saw Butler lying face down on the ground.

[6] A short time later, IMPD officers and detectives responded to a 911 dispatch about the shooting. Upon their arrival, the officers found the owner of the 28th Street residence standing over Butler, who was bleeding from the chest and throat area. They also noticed a .44 caliber revolver on the ground next to Butler. The EMTs arrived and pronounced Butler dead shortly thereafter.

[7] The police officers secured the area and observed five spent 9 mm shell casings near Butler's body. Butler had sustained five gunshot wounds, including one shot to the corner of his mouth, shots to the right and left sides of his chest, and

shots to his right and left thigh. A 9mm bullet remained lodged in Butler's chest.

[8]     When the officers initially spoke to Holifield, she provided an incorrect last name because there was an outstanding warrant for her arrest. Holifield also denied any knowledge of the shooting, claiming that she had been watching television with a friend inside the 28th Street residence. Holifield later told the detectives what she had seen and identified Harris as the only shooter.

[9]     The day after the shooting, Harris saw Butler's mother sitting on the porch of her residence. Harris approached her, pointed a gun in her direction, and stated that he did not have anything to do with the shooting.

[10]    On October 4, 2017, Harris was arrested at a residence on Boulevard Place in Indianapolis. While executing a search warrant at the house, the police seized several new pairs of shoes and various new clothing items that were still in shopping bags. Three phones were seized, including a silver iPhone and a white iPhone on a bed next to a school ID card that belonged to Harris's girlfriend.

[11]    After obtaining search warrants to extract data from the phones, the white iPhone showed a video of Harris "flashing money" in the back of a vehicle. *Transcript Vol. III* at 102; *State's Ex.* 83. That phone also revealed that someone had used the phone to visit Butler's Facebook profile at approximately 11:00 p.m. on the evening of the shooting and had viewed two news videos regarding the 28th Street shooting.

[12]     At some point, the police interviewed Harris in the presence of his parents. Although Harris initially denied being at the 28th Street residence when Butler was killed, he later admitted that he was there but had nothing to do with the shooting. The State charged Harris with murder on October 6, 2017. Thereafter, the State amended the charging information to include a sentence enhancement count for Harris's use of a firearm during the commission of the offense.

[13]     While awaiting trial, Harris called his girlfriend from the jail and the two discussed the iPhone video. Harris told his girlfriend that others would see him in the video holding a lot of cash. Harris also talked with other friends about the witnesses who would testify against him, and Harris told them that he had a copy of the probable cause affidavit that listed the names of the "snitches." *Id.* at 174.

[14]     At Harris's jury trial that commenced on September 23, 2019, several police officers testified about the items of clothing that were seized during the search of the Boulevard Place residence. The trial court denied Harris's relevancy objection and admitted photos of those items into evidence.

[15]     A firearms examiner testified for the State that five of the spent cartridge casings found near Butler's body were fired from the same 9 mm firearm, and not from the revolver found next to Butler. The trial court admitted a drawing into evidence that showed the location of Butler's gunshot wounds. That diagram was prepared by Dr. Christopher Poulos who conducted Butler's autopsy. Dr.

Poulos concluded that Butler's death was a homicide and that the multiple gunshot wounds were the cause of death.

[16] Also attached to the autopsy report were toxicology test results that showed the presence of Xanax and THC in Butler's system. Harris sought to have the toxicology results admitted into evidence, along with the autopsy report on the grounds that those documents were part of a business record. The State objected to the admission of the toxicology report, whereupon the trial court conducted a hearing outside the jury's presence.

[17] During the hearing, Dr. Poulos testified that while it is standard protocol for the coroner's officer to collect and provide blood samples for toxicology analysis, he is not personally involved in the testing or the preparation of the toxicology report. Dr. Poulos explained that the toxicology findings are routinely included with the autopsy report. Dr. Poulos further testified that while the substances in Butler's system might have affected Butler's state of mind at the time of the shooting, he could not testify about the precise effects they may have had on Butler because he is not a toxicologist or pharmacologist. Dr. Poulos stated that he could provide only "generalities as to what a given compound would have done to an individual," noting the "studies" cited in the toxicology report. *Id.* at 77–78.

[18] The trial court excluded the toxicology report from evidence, finding that it was not relevant to establishing Butler's state of mind at the time of the shooting. The trial court expressed concern about Dr. Poulos being placed in a position of

testifying outside his area of expertise, and the possibility that the jury could be misled and confused about the central issues in the case.

[19] After the evidence was presented, the jury found Harris guilty as charged. Harris waived his right to a jury trial on the sentence enhancement count and requested the trial court to issue its finding at sentencing. At the sentencing hearing on October 17, 2019, the trial court noted that Harris was first adjudicated a delinquent at the age of twelve and has since accumulated four misdemeanor and four felony delinquency adjudications. Harris was also on pretrial release for armed robbery when he committed the instant offense. While awaiting trial for Butler's murder, Harris accumulated over twenty misconduct violations for breaking jail and Indiana Department of Correction (DOC) rules.

[20] The trial court identified Harris's lack of remorse and lack of respect, his significant juvenile delinquency history, and the fact that he committed the instant offense while on pretrial release, as aggravating factors. It then found Harris's age as a mitigating circumstance and determined that the aggravators outweighed any mitigating factors. The trial court stated on the record that it was sentencing Harris to fifty-five years for murder and enhancing that term by twenty years for use of a firearm during the commission of that offense. However, the abstract of judgment and written sentencing order omitted the twenty-year enhancement.

[21] Harris now appeals.

# Discussion and Decision

## I. Evidentiary Rulings

[22] Harris first claims that the trial court abused its discretion in excluding the toxicology results because the presence of Xanax and THC in Butler's system at the time of the shooting was relevant to establish Butler's state of mind. Harris argues that the exclusion of this evidence necessarily precluded him from raising a self-defense claim.

[23] We initially observe that evidence is relevant "if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Indiana Evid. R. 401. The decision to admit or exclude evidence falls within the trial court's discretion and is reviewed for an abuse of that discretion. *Dycus v. State*, 108 N.E.3d 301, 303 (Ind. 2018). The ruling on the admission or exclusion of evidence warrants reversal only if the decision was clearly against the logic and effect of the facts and circumstances before it. *Id.* Furthermore, a claim that the trial court erred in the admission or exclusion of evidence will not prevail on appeal unless the error affects the substantial rights of the defendant. *Nicholson v. State*, 963 N.E.2d 1096, 1099 (Ind. 2012). There is a strong presumption that the trial court properly exercised its discretion when ruling on the admissibility of evidence. *Warner v. State*, 773 N.E.2d 239, 247 (Ind. 2002). Thus, we will affirm the trial court's decision on any basis apparent in the record, whether or not relied on by the trial court. *Jeter v. State*, 888 N.E.2d 1257, 1267 (Ind. 2008).

[24] In this case, Harris sought to have the entire autopsy report admitted into evidence that included the attached toxicology results. Harris claimed that those results would establish Butler's state of mind during the confrontation. And because the evidence showed that Xanax and THC both have depressant and reality distorting effects, Harris asserts that Dr. Poulos was qualified to testify as to how Butler might have behaved or acted under the influence of those drugs.

[25] Notwithstanding Harris's claim, Dr. Poulos testified that he was not able to testify about how an individual might react to a given drug. Dr. Poulos also could not state when Butler ingested the drugs or how much he had consumed. When Harris sought to have the toxicology results admitted, no prior testimony had been offered as to Butler's behavior at the time of the shooting, or whether Butler might have become violent or aggressive when under the influence of the drugs.

[26] In the absence of evidence that Butler provoked Harris or that Butler was likely to become aggressive when intoxicated, we agree with the trial court that the toxicology results might very well have confused the issues and misled the jury. Butler may have taken the drugs several days before the shooting, and it is not known what impact the Xanax and THC would have had on Butler.

[27] Moreover, Harris has failed to demonstrate that the exclusion of this evidence prevented him from advancing an alleged self-defense claim. Harris has not demonstrated that excluding the toxicology results limited his ability to present

evidence of Butler's behavior. For all these reasons, we conclude that the trial court did not abuse its discretion in excluding Butler's toxicology results from the evidence.

[28] Harris also contends that the trial court erred in admitting photographs of the clothing and shoes that were seized from the Boulevard Place residence. Harris argues that this evidence was irrelevant as to whether he shot and killed Butler and that it was offered only for the purpose of portraying him "as a hardened criminal who couldn't wait to selfishly spend [the stolen money]." *Appellant's Brief* at 25.

[29] The evidence established, among other things, that Harris took a substantial amount of cash from Butler and was in possession of new and expensive items shortly after the shooting. This evidence, along with the other evidence presented at trial that included Holifield's eyewitness testimony that Harris pointed the gun at Butler and demanded his money just before Butler was shot and killed, was relevant and admissible to show that Harris committed the charged offense. *See, e.g., Murray v. State,* 479 N.E.2d 1283, 1289 (Ind. 1985) (evidence of a large quantity of drugs, scales, and a substantial amount of cash seized from an apartment where the defendant had previously sold drugs, was relevant and material to show that the defendant was involved in possessing and dealing in illegal drugs). Thus, Harris's claim that the trial court abused its discretion in admitting this evidence, fails.

## II. Sentencing

## A. *De Facto* Life Sentence

[30]  Harris argues that the aggregate seventy-five-year sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. Harris maintains that the sentence cannot stand because the trial court imposed a *de facto* life sentence, and no evidence was presented regarding the "significance of [Harris's] youth and [the] attendant characteristics." *Appellant's Brief* at 18.

[31]  Our Supreme Court recently considered the issue of *de facto* life sentences, along with a sentencing court's duty to address a defendant's youth and its attendant circumstances prior to sentencing a child to life in prison, in *Wilson v. State,* No. 19S-PC-548 (Ind. Nov. 17, 2020).[1]

[32]  In *Wilson*, the sixteen-year-old defendant was sentenced to 183 years following his convictions for two counts of murder and armed robbery and an enhancement for criminal gang activity. When imposing the sentence, the trial

---

[1] Our Supreme Court also decided *State v. Stidham,* No. 20S-PC-634 (Ind. Nov. 17, 2020), that same day. In *Stidham,* the defendant committed murder and several other crimes when he was a juvenile and was ultimately sentenced to 138 years of incarceration—the maximum that could be imposed at the time. After several appeals, our Supreme Court ultimately determined that this sentence was inappropriate under Indiana Appellate Rule 7(B) and reduced Stidham's sentence to an aggregate term of eighty-eight years. *Slip op.* at 18. Because the *Stidham* Court found the defendant's argument under App. R. 7(B) dispositive, it declined to address the additional claim that the sentence amounted to "an impermissible discretionary *de facto* life-without-parole sentence." *Slip op.* at 7.

court cited several aggravating factors, and identified Wilson's youth as a mitigating factor.

[33]    Thereafter, Wilson petitioned for post-conviction relief, alleging ineffective assistance of both trial and appellate counsel. The post-conviction court denied Wilson's request for relief, and a panel of this court reversed. Our Supreme Court granted the State's petition for transfer, and first addressed Wilson's claim that his sentence constituted cruel and unusual punishment under the Eighth Amendment. *Id., slip op.* at 7. In determining that it did not, the Court discussed the recent evolution in juvenile sentencing requirements. More particularly, it noted that nearly ten years ago, *Miller v. Alabama,* 567 U.S. 460 (2012) determined that the Eighth Amendment "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile [murderers]." *Id.* at 479. As a result, *Miller* provides that the sentencing court in such cases "[a]t the least, . . . should look at" the "hallmark features" of youth, the defendant's background, and "the circumstances of the homicide offense" before imposing a "discretionary life without parole sentence." *Id.* at 477–78.

[34]    The *Wilson* Court observed that since *Miller,* a split of authority has developed as to whether a term of years sentence constitutes a "*de facto"* life without parole sentence that implicates heightened fact-finding sentencing requirements. *Slip op.* at 11. More specifically, the Court observed that some jurisdictions have held that *Miller's* requirements apply to term-of-years-sentences that are lengthy enough to be considered *de facto* life sentences, while a handful of others find

*Miller* inapplicable to aggregate sentences that exceed the juvenile's life expectancy. *Id.* at 12. There are also jurisdictions that apply the *Miller* requirements only to *de jure* life-without-parole sentences and not to other discretionary sentences, including life with the possibility of parole. *Id.* at 13. *Wilson* observed that "[the] courts . . . are split approximately evenly on whether *Miller . . .* should be extended to at least *some de facto* life sentences." *Slip op.* at 13 (emphasis added).

[35] In its thoughtful analysis of the differing rationales, the Court noted that *Miller* and at least one other United States Supreme Court case explicitly stated that their holdings are *limited* to the "particular" penalty of "life without parole." *Id.* at 14. *See Miller*, 567 U.S. at 83; *Graham v. Florida,* 560 U.S. 48, 50 (2010). Thus, the *Wilson* Court reasoned that the "implication from this distinction is that the *Miller* holding was "not meant to extend to . . . other types of sentences." *Wilson, slip op.* at 14. The Court observed that an attempt at determining what constitutes a *de facto* life sentence would be a "line drawing exercise" that can end up "creating requirements that would vastly alter sentencing procedures for a large swath of juveniles." *Id.* at 16. Hence, the Court commented that "'while we are duty-bound to enforce the Eighth Amendment consistent with the Supreme Court's directives' we must interpret this precedent based 'upon case-specific holdings rather than general expressions in an opinion that exceed the scope of any particular holding.'" *Wilson, slip op.* at 16 (quoting *State v. Slocumb,* 827 S.E.2d 148, 153 (S.C. 2019)). The Court concluded that the enhanced protections in *Miller* did not apply to

the defendant's 181-year "term of years sentence" and thus, such sentence did not violate the Eighth Amendment "because [the] *Miller* [holding] . . . applies *only* to life-without-parole sentences." *Slip op* at 16-17 (emphasis added).

And so it is here. Harris was sentenced to an aggregate seventy-five-year term of incarceration. That sentence does not violate the Eighth Amendment because, as our Supreme Court has held, the protections outlined in *Miller* for juvenile life-without-parole sentences do not apply to Harris's "term of years sentence." *See Wilson, slip op*. at 29. We thus proceed to address Harris's argument that his sentence was inappropriate under App. R. 7(B).

### B. Inappropriate Sentence

Harris claims that the eighty-five-year-sentence was inappropriate when considering the nature of the offense and his character. *See* App. R. 7(B). Harris argues that his sentence should be revised to a term of forty-five years for murder and enhanced by five years based on his possession of a firearm.

App. R. 7(B) provides the standard by which we exercise our constitutional authority to review and revise sentences. We "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [this] Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." App. R. 7(B). Whether we find a sentence inappropriate "turns on myriad factors that come to light in a given case" and ultimately "boils down to our collective sense of what is

appropriate." *Taylor v. State*, 86 N.E.3d 157, 165 (Ind. 2017). The trial court's findings of aggravators and mitigators does not limit our review under Appellate Rule 7(B). *Brown v. State*, 10 N.E.3d 1, 4 (Ind. 2014).

[39] The "principal role of our review is to leaven outliers rather than achieving a perceived correct sentence." *Gibson v. State*, 51 N.E.3d 204, 215 (Ind. 2016). The question under App. R. 7(B) analysis is "not whether another sentence is more appropriate" but rather "whether the sentence imposed is inappropriate." *Merriweather v. State,* 151 N.E.3d 1281, 1286 (Ind. Ct. App. 2020). It is the defendant's burden to persuade us that the sentence is inappropriate. *Crabtree v. State,* 152 N.E.3d 687, 704 (Ind. Ct. App. 2020). In determining whether a sentence is inappropriate, the advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Flowers v. State,* 154 N.E.3d 854, 873 (Ind. Ct. App. 2020).

[40] Harris was convicted of murder, which carries a sentencing range of between forty-five years and sixty-five years, with an advisory term of fifty-five years. Ind. Code § 35-50-2-3(a). The firearm enhancement has a sentencing range of between five years and twenty years. I. C. § 35-50-2-11(g). With this general guidance in mind, we consider whether Harris's aggregate seventy-five-year sentence is inappropriate in light of the nature of his offenses and his character.

[41] The "nature of the offense is found in the details and circumstances of the commission of the offense." *Townsend v. State*, 45 N.E.3d 821, 831 (Ind. Ct. App. 2015), *trans. denied.* Harris admits the "seriousness of this crime and its

atrocity . . . and does not seek to minimize its gravity." *Appellant's Brief* at 26. Hence, he does not claim that the nature of the offense warrants a revision of his sentence. Thus, we proceed to address Harris's claim that the sentence was inappropriate when considering his character.

[42] We note that "the character of the offender is found in what [is learned] of the offender's life and conduct." *Washington v. State*, 940 N.E.2d 1220, 1222 (Ind. Ct. App. 2011), *trans. denied*. A defendant's criminal history and willingness to continue committing crimes is relevant for analysis of character under App. R. 7(B). *Garcia v. State*, 47 N.E.3d 1249, 1251 (Ind. Ct. App. 2015), *trans. denied*.

[43] Although Harris was only seventeen years old when he shot and killed Butler, his life of crime began at the age of twelve. By the time Harris was eighteen years old, he had accumulated four misdemeanor and four felony delinquency adjudications. Two of those adjudications involved the dangerous possession of a firearm. Harris had also been waived to adult court on a pending armed robbery charge.

[44] Harris participated in some court-ordered services, but his successful completions of those programs occurred early in his juvenile history. As a juvenile, Harris failed probation, violated supervised release, and was eventually sentenced to the DOC as a juvenile.

[45] When Harris was on pre-trial release for the pending armed robbery charge that had been waived to adult court, he committed the instant offense. From the time that Harris was incarcerated for this offense until the time that the

Presentence Investigation Report was filed, Harris had committed over twenty prison and county jail violations. Harris's escalating criminal history at a relatively young age demonstrates his unwillingness and inability to reform his behavior. His actions show that he has a clear disregard for the law, authority, and rehabilitation objectives.

[46] Harris's poor character is further exhibited by his actions after he committed this offense, including his lies to the police, the lack of remorse, and his failure to accept responsibility for his actions. Harris approached Butler's mother the day after the murder, pointed a gun in her direction, and denied committing the murder. During phone calls from the jail, Harris sought to prevent Holifield and others from testifying against him. All of these circumstances reflect poorly on Harris's character.

[47] In sum, Harris has failed to show that his sentence is inappropriate when considering the nature of his offense and his character.

### C. Remand for Correction of Sentencing Order

[48] On cross-appeal, the State contends, and we agree, that this case must be remanded for a correction of the trial court's sentencing order. The State points out that the sentence the trial court announced at the hearing included the twenty years on the firearm enhancement, while the written sentencing order and abstract of judgment do not.

[49] When oral and written sentencing statements conflict, we will examine them together to discern the intent of the sentencing court. *Walker v. State*, 932 N.E.2d 733, 738 (Ind. Ct. App. 2010). When such a conflict is apparent, we may remand the case for the correction of clerical errors. *Willey v. State*, 712 N.E.2d 434, 445 n.8 (Ind. 1999); *Walker*, 932 N.E.2d at 738.

[50] At the sentencing hearing, the trial court announced on the record that he was sentencing Harris to fifty-five years for murder, plus a twenty-year enhancement for the use of a firearm in committing that offense. But the trial court's written sentencing order and the abstract of judgement omit the twenty-year enhancement.

[51] Harris acknowledges that the trial court's oral sentencing order is correct, in that he concedes that the aggregate sentence imposed was seventy-five years. Based on the unambiguous nature of the trial court's oral sentencing pronouncement, we conclude that the abstract of judgment and sentencing order contain an obvious clerical error. Thus, we remand this case for a correction of that error to include the twenty-year enhancement. In all other respects, the judgment of the trial court is affirmed.

[52] Affirmed and remanded.

Riley, J. and May, J., concur.